PEOPLE v HENRY (AFTER REMAND)

Docket Nos. 306449 and 308963. Submitted March 24, 2014, at Lansing. Decided May 8, 2014, at 9:00 a.m. Leave to appeal sought.

Randall E. Henry was convicted following a jury trial in the Ingham Circuit Court, Joyce A. Draganchuk, J., of five counts of armed robbery. Defendant brought two separate appeals from his convictions. The Court of Appeals consolidated the appeals and remanded the matter to the trial court for an evidentiary hearing to develop a factual record to allow the Court of Appeals to address defendant's Fourth Amendment challenge and his claim of ineffective assistance of counsel. *People v Henry*, unpublished opinion per curiam of the Court of Appeals, issued December 5, 2013 (Docket Nos. 306449 and 308963). On remand, the trial court conducted an evidentiary hearing and affirmed the convictions.

After remand, the Court of Appeals *held*:

1. The trial court did not err, under the unique facts and circumstances of this case, by holding that the police officers' entry into the apartment where defendant was located and detained was reasonable. The entry of the apartment without a warrant was proper under the hot pursuit exception to the warrant requirement. In addition, other exigencies supported the officers' entry into the apartment. The trial court did not clearly err by making its findings of fact or by concluding that the entry of the apartment without a warrant was lawful.

2. Because the entry without a warrant was lawful and a motion to suppress evidence obtained as a result of the entry would have been futile, defense counsel was not ineffective for failing to move to suppress the evidence.

3. There was sufficient evidence to allow a rational juror to convict defendant of committing an armed robbery on November 20, 2010, beyond a reasonable doubt.

4. The trial court erred by holding that during custodial interrogation by the police defendant unequivocally waived his Fifth Amendment right to remain silent. Because the police failed to scrupulously honor defendant's initial assertion of his right to remain silent and because the police subsequently led defendant to

believe that he was not relinquishing his rights by agreeing to make a statement, the trial court erred by concluding that defendant knowingly and intelligently waived his Fifth Amendment rights. However, given the untainted evidence, admission of the statements was harmless beyond a reasonable doubt. It is clear beyond a reasonable doubt that a rational jury would have found defendant guilty absent the error.

5. A police detective's testimony regarding a confidential informant's out-of-court statements was improperly admitted. However, defendant cannot show that the improper testimony affected his substantial rights because he cannot show that it affected the outcome of the lower court proceedings. Defendant is not entitled to a new trial on this basis.

6. The trial court did not abuse its discretion by finding that defendant failed to demonstrate a need for the confidential informant's testimony. The trial court did not abuse its discretion by denying defendant's motion to produce the informant because the informant would not have offered any material or exculpatory evidence. The failure to produce the confidential informant did not amount to a violation of the holding in *Brady v Maryland*, 373 US 83 (1963), that the prosecution's failure to disclose exculpatory or material evidence in its possession constitutes a due process violation regardless of whether a defendant requested the evidence. Undisclosed evidence is deemed material only if it could reasonably be taken to put the whole case in such a different light that it would undermine confidence in the verdict. In this case, the informant would not have offered material or exculpatory evidence and the failure to produce the informant did not undermine confidence in the verdict. No *Brady* violation occurred.

7. Although the information may have been filed in court after defendant waived arraignment, the record supports the conclusion that defendant had an opportunity to review the information before it was filed. Defendant also attended the preliminary examination. Defendant was aware of the charges against him even though the trial court did not hold an arraignment. Defendant cannot show prejudice from the failure to hold an arraignment, which is required to merit relief.

8. Nothing about the photographic lineup shown to Kelly Buell, one of the armed robbery victims, was unduly suggestive. The trial court did not err by allowing Buell to offer identification testimony at trial.

Affirmed.

BOONSTRA, J., concurring in part and dissenting in part, concurred fully with regard to Parts I, II, III, and V to VIII of the majority opinion and the corresponding portions of its concluding Part IX. Judge BOONSTRA also concurred with the result reached in Part IV of the majority opinion and in the corresponding portion of its Part IX. He dissented from the conclusion of the majority in Part IV of its opinion that the trial court erred, even harmlessly, by admitting into evidence the statements defendant made to the police detectives and would find that no violation of the procedures provided in *Miranda v Arizona*, 384 US 436 (1966), occurred. The detectives did not engage in the improper interrogation of defendant in violation of *Miranda*. Defendant did not make an unequivocal invocation of his right to remain silent. The detectives therefore were permitted to continue the interview. The detectives did not fail to scrupulously honor any exercise of defendant's right to cut off questioning. The confusion that resulted from the detectives' inartful attempt to comply with *Miranda* was remediable and the detectives were able to clear up the confusion and secure a valid *Miranda* waiver. Any confusion that initially resulted did not result in a statement procured by coercion or given by a defendant ignorant of the consequences of his or her actions. There was no interrogation of defendant for purposes of *Miranda*. The term "interrogation" under *Miranda* refers not only to express questioning but also to its functional equivalent—words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. "Interrogation," as conceptualized in *Miranda*, must reflect a measure of compulsion above and beyond that inherent in custody itself. The detectives did not engage in express questioning or its functional equivalent before defendant signed a valid *Miranda* waiver. To constitute "express questioning" for purposes of *Miranda*, questions must be ones that the police should know are reasonably likely to elicit an incriminating response from the suspect and must be other than those normally attendant to arrest and custody. The pertinent question at issue in this case was one that is normally attendant to arrest and custody and did not constitute express questioning within the meaning of *Miranda*. The detectives' follow-up question did not exhibit even the least amount of coercion or compulsion, subtle or otherwise. There was no interrogation. Defendant knowingly and voluntarily expressly waived his *Miranda* rights. The waiver was effective. The convictions and sentences must be affirmed.

*Bill Schuette*, Attorney General, *Aaron D. Lindstrom*, Solicitor General, *Stuart J. Dunnings III*, Prosecuting Attorney, *Joseph B. Finnerty*, Chief, Appellate Division, and *Susan Hoffman Adams*, Assistant Prosecuting Attorney, for the people.

State Appellate Defender (by *Douglas W. Baker*) for defendant.

Randall K. Henry *in propria persona*.

AFTER REMAND

Before: BORRELLO, P.J., and M. J. KELLY and BOONSTRA, JJ.

BORRELLO, P.J. In these consolidated appeals, in Docket No. 308963, defendant appeals as of right his jury-trial convictions on four counts of armed robbery, MCL 750.529. In Docket No. 306449, defendant appeals as of right his conviction on one count of armed robbery, MCL 750.529. The trial court joined the cases and both were tried before the same jury. The trial court sentenced defendant as a fourth-offense habitual offender, MCL 769.12, to 216 to 420 months' imprisonment for each conviction. We previously remanded this case to the trial court for an evidentiary hearing to develop a factual record to allow us to address defendant's Fourth Amendment challenge and his claim of ineffective assistance of counsel.[1] On remand, the trial court conducted an evidentiary hearing and affirmed defendant's convictions. Having an adequate factual record to facilitate our review, for the reasons set forth in this opinion, we affirm defendant's convictions and sentences.

---

[1] *People v Henry*, unpublished opinion per curiam of the Court of Appeals, issued December 5, 2013 (Docket Nos. 306449 and 308963).

Defendant's convictions arise out of a series of armed robberies that occurred at the L & L Gas Express in Lansing on November 16, November 17, November 20, and December 2, 2010, and one armed robbery that occurred at a nearby Quality Dairy on December 2, 2010. A detailed overview of the relevant facts is set forth in our previous opinion and we need not repeat it here. See *People v Henry*, unpublished opinion per curiam of the Court of Appeals, issued December 5, 2013 (Docket Nos. 306449 and 308963). The police ultimately arrested defendant on December 5, 2010, at an apartment complex located near the L & L Gas Express after entering an apartment without a warrant. We remanded this case to the trial court to develop a factual record concerning the entry without a warrant and concerning trial counsel's decision not to raise a Fourth Amendment challenge. *Id*. The following is an overview of the evidence that was introduced at the evidentiary hearing:

On December 4, 2010, Lansing Police Officer Aaron Terrill responded to a call from an anonymous man in the parking lot of the L & L Gas Express. The man offered information about recent armed robberies in the area. The anonymous man told the officer that the robberies were committed by another man with whom he had smoked crack cocaine at 1100 Dorchester, Apartment 104, two nights before. He told the officer that the suspect was in the apartment at that moment.

Officer Terrill went to Apartment 104 at 1100 Dorchester. He walked around the outside of the building and looked at the windows and doors. Officer Terrill saw no signs of forced entry or anything out of the ordinary. He contacted his supervisor, Sergeant Lee Curtis, and advised him of the situation. Sergeant

Curtis told Officer Terrill that he had no authority to enter the apartment, so Officer Terrill left.

The next day at around 11:45 a.m., Officer Terrill was patrolling when he heard a call over the radio about a larceny or robbery at Jackie's Diner, at 3812 Martin Luther King Boulevard. The restaurant was 0.3 miles from 1100 Dorchester. Officer Terrill radioed other police units about the information he learned the previous day and advised them "that they may want to head to 1100 Dorchester, 104."

Lansing Police Officer Ellen Larson was one of the officers dispatched to Jackie's Diner. The time of the incident was 11:45 a.m., according to her police report. She spoke to three or four witnesses. Officer Larson learned that the suspect had been in the restaurant for a long time. At one point, the suspect went into the bathroom. When he came out, he went to the counter and paid $5 for his bill. The suspect told the cashier that there was a problem in the bathroom. The cashier left the cash register and went into the bathroom. The suspect then took a cash drawer from the register. Officer Larson radioed a description of the suspect to other officers, including that the suspect was an African-American male wearing a black puffy coat.

Four witnesses to the incident at Jackie's Diner left the restaurant and drove around the area looking for the suspect. They spotted him leaving an auto parts store on Martin Luther King at Mary Street, about a quarter of a mile from Jackie's Diner. The suspect got into a car and drove away. The witnesses followed the vehicle to 1100 Dorchester. They remained in telephone contact with the police dispatcher and provided the suspect's license plate information. The dispatcher conveyed the witnesses' information to Lansing Police

Officers Rachael Bahl and Jason Pung. The officers proceeded separately to 1100 Dorchester.

Officers Bahl and Pung met the witnesses at the Dorchester apartments. Officer Pung arrived first. The witnesses said that they saw the suspect pull his car into the driveway behind the apartment building. He got out of the car and disappeared down a flight of stairs to the bottom level of the building. Officer Bahl radioed the information from the witnesses to other officers, who proceeded to the apartment building.

The Dorchester apartments are a "rundown multi-level, multiunit complex" with two or three floors. The ground-floor apartments are slightly below ground level, or "somewhat underground." Access to the units is provided through exterior doors, similar to the design of a motel.

Officer Pung established a point of containment to prevent the suspect from escaping if he was still in the area. The officer received information from the police dispatcher that the suspect may have gone to Apartment 104. Apartment 104 was in the 1100 building, on the ground level, in the same area that the witnesses had indicated. The place from which the suspect disappeared from view is the hallway area that leads to Apartment 104.

Lansing Police Sergeant Joe Brown supervised the operations of the officers responding to the incident at Jackie's Diner. Sergeant Brown became involved in the investigation at approximately 11:55 a.m., when he received radio information directing him to Apartment 104. Sergeant Brown arrived at the apartment within a half an hour of the time of the initial call from Jackie's Diner.

Officer Pung stood on the left (hinge) side of the door to Apartment 104, with other officers behind him.

Sergeant Brown stood to the right of the door. Officer Pung knocked and announced, "Lansing Police" several times. He received no response. Sergeant Brown noticed that the window to the right of the door was slightly open, about an eighth of an inch. He saw pry marks in the lower-left part of the metal frame. The pry marks suggested that a forced entry had occurred. The window blinds were closed. Sergeant Brown pulled on the window, which slides from left to right, to see if it was locked, and the window opened completely. The location and size of the window would have allowed a person to easily step through the window into the apartment.

Sergeant Brown provided cover while Officer Pung reached through the open window and unlocked the deadbolt lock on the apartment door. The officers entered the apartment through the door. They performed a protective sweep of the apartment and found defendant and Mark Aimery in a back bedroom.

Mark Aimery was the person suspected of committing the theft at Jackie's Diner.[2] Lansing Police Officer Ryan Wilcox was one of the officers involved in the sweep of the apartment. He arrived at the apartment building at 11:55 a.m. Officer Wilcox spoke with defendant. Officer Wilcox observed that defendant and Aimery were in the process of or had just finished smoking crack cocaine. A black puffy coat was on the couch. Aimery was arrested.

Defendant was detained. A few hours later, a search warrant for the apartment was obtained and executed.

At the evidentiary hearing, Sergeant Brown testified that when he entered the apartment, he was concerned

---

[2] Aimery pleaded no contest to a charge of larceny in a building, MCL 750.360, for the theft at Jackie's Diner. Aimery's judgment of sentence was admitted at the hearing.

for the safety of persons inside the apartment. He knew that a felony suspect was in the area and he saw pry marks that could have been fresh, suggesting a forced entry. Sergeant Brown also had information from Officer Terrill about Apartment 104. When the sergeant discovered that the window was unsecure, he "felt it appropriate just to make sure that everybody was okay inside and the apartment was secure." Because the blinds were closed, Sergeant Brown was unable to see into the apartment to discern whether someone had gained entry or whether there was damage inside the apartment.

Sergeant Brown was asked about his written report, which did not mention pry marks on the window frame, and his statement in the report: "I could not determine if the window had damage from forced entry, due to the vertical blinds getting in the way." He explained that his reference to not seeing damage pertained to his inability to see into the apartment. The blinds in the window prevented him from assessing whether there was damage or forced entry to the interior of the apartment. Sergeant Brown testified "that it would have been better to articulate that [in the police report]. But I'm clear in my memory that the damage was there on the outside."

Sergeant Brown identified photographs of the exterior of the apartment building that were taken on December 5, 2010, after the police entered and secured the apartment. The photographs showed the partially open window of Apartment 104. Sergeant Brown testified that except for the degree to which the window was open, the photos accurately depicted what he saw when he arrived at the apartment.

Officer Terrill was shown a photograph of the window of Apartment 104. Officer Terrill recognized the

window. He testified that the photograph depicted pry
marks on the lower side around the window. He testi-
fied that when he observed the window on December 4,
2010, he saw no damage around the window, "there was
nothing."

Officer Pung testified that when he responded to the
area of Jackie's Diner, "the initial call was a robbery. It
was later determined to be more of a snatch and grab
larceny." The officer testified that at the apartment, he
was concerned about the open window. His experience
led him to believe that the apartment was in a high
crime area where people do not normally leave windows
open. Knowing that a suspect had fled from Jackie's
Diner, Officer Pung was "concern[ed] that someone
may have entered unlawfully and that the security
needed to be checked."

Officer Bahl clarified that she was not dispatched to
Jackie's Diner. She responded to check the area, and
then proceeded to the Dorchester apartments, while
other officers were at the restaurant talking to wit-
nesses. Officer Bahl testified that the length of time
from when she first heard the radio report of an
incident at Jackie's Diner to when she was actually
speaking to the witnesses at the apartment was no
greater than 15 minutes. Officer Bahl said that she was
in the immediate area "and information was being
relayed to everybody." "[T]here were numerous officers
involved at different locations, information being re-
layed[.]" Officer Bahl had been involved in some of the
earlier investigations of the L & L gas station robberies,
which occurred one block south of the apartment build-
ing.

Defense counsel elicited testimony from Officers
Bahl and Larson that the police had no information that
the incident at Jackie's Diner involved the use of a

weapon or threats. However, Officer Bahl clarified that her discussions with the witnesses who followed the suspect pertained only to what they saw after leaving the diner; she did not interview them about what occurred at the diner.

The trial court determined that the entry was proper under the "exigent circumstances exception" to the warrant requirement and that trial counsel was not ineffective by failing to raise a Fourth Amendment challenge.

## I. ENTRY WITHOUT A WARRANT

Defendant argues that the police were not justified in entering the apartment without a warrant and claims that the evidence seized during the entry, including clothing that matched clothing worn by the perpetrator of the armed robberies, should have been suppressed.

We review de novo a trial court's ruling on a motion to suppress evidence. *People v Williams*, 472 Mich 308, 313; 696 NW2d 636 (2005). The trial court's factual findings are reviewed for clear error, *People v Hyde*, 285 Mich App 428, 436; 775 NW2d 833 (2009), and the underlying constitutional issues, including whether a Fourth Amendment violation occurred, are reviewed de novo. *People v Gillam*, 479 Mich 253, 260; 734 NW2d 585 (2007).

The United States and the Michigan Constitutions guarantee the right to be secure against unreasonable searches and seizures. US Const, Am IV; Const 1963, art 1, § 11; *People v Jenkins*, 472 Mich 26, 31; 691 NW2d 759 (2005). "Generally, a search conducted without a warrant is unreasonable unless there exist both probable cause and a circumstance establishing an exception to the warrant requirement." *People v Snider*, 239 Mich App 393, 407; 608 NW2d 502 (2000) (quotation marks

and citation omitted). "One of the exceptions to the Fourth Amendment warrant requirement is the so-called 'exigent circumstances' exception." *People v Cartwright*, 454 Mich 550, 558; 563 NW2d 208 (1997). " 'Hot pursuit' is a form of 'exigent circumstances.' " *People v Raybon*, 125 Mich App 295, 301; 336 NW2d 782 (1983), citing *Warden v Hayden*, 387 US 294; 87 S Ct 1642; 18 L Ed 2d 782 (1967). "Under the hot pursuit exception, an officer may chase a suspect into a private home when the criminal has fled from a public place." *Smith v Stoneburner*, 716 F3d 926, 931 (CA 6, 2013), citing *Warden*, 387 US at 294, 298-299. Other recognized exigencies include the need to prevent the imminent destruction of evidence, to preclude a suspect's escape, and where there is a risk of danger to the police or others inside or outside a dwelling. *Cartwright*, 454 Mich at 558. In the absence of hot pursuit, the police must have probable cause to believe that at least one of the other three circumstances exists, and the gravity of the crime and the likelihood that a suspect is armed should be considered. *Id*. The validity of a search without a warrant ultimately turns on the reasonableness of the search, as perceived by the police. *Id*. at 561.[3]

Under the unique facts and circumstances of this case, we conclude that the trial court did not err by holding that the officers' entry into the apartment was reasonable. The police were pursuing a fleeing felon from a public place. Witnesses from Jackie's Diner spotted the suspect coming from the auto parts store in the area and followed him to the apartment building. They were in constant contact with the police dispatcher, and the dispatcher relayed their information to the police officers on the ground. The witnesses directed

---

[3] We previously determined that defendant has standing to challenge the entry without a warrant. See *Henry*, unpub op at 5.

the officers to the area of the apartment building where the witnesses had observed the fleeing suspect descend the stairs and disappear. Their information provided support for a belief that the suspect had gone into Apartment 104. The officers had information from Officer Terrill that the suspect in the string of armed robberies was staying in Apartment 104. Notably, the evidence established that the entry occurred just 10 or 15 minutes after the initial report of the incident at Jackie's Diner at 11:45. Officer Bahl was already in the process of interviewing the witnesses at the apartment building within 15 minutes of receiving the information at 11:45 a.m., and she arrived after Officer Pung. Officer Wilcox and Sergeant Brown arrived at the apartment at 11:55. In light of the short distance between the restaurant and the apartment, and the rapidity with which the events unfolded, entry was proper under the hot pursuit exception to the warrant requirement. See *Warden*, 387 US at 294.

In addition, other exigencies supported the officers' entry into the apartment. Not only did the officers have reason to believe that the fleeing suspect was in Apartment 104, they also had reason to believe that he might have broken into the apartment, putting innocent people in danger. *Cartwright*, 454 Mich at 558. Sergeant Brown's observation of fresh pry marks on the frame of the window of Apartment 104, and the small opening of the window, raised his and Officer Pung's concerns about a possible break-in. The sergeant testified that the pry marks looked fresh, which is consistent with Officer Terrill's testimony that he saw no damage to the window frame of Apartment 104 when he was there the previous day. Sergeant Brown explained the alleged discrepancy in his police report about window damage, and the trial court found him to be credible. Photographs taken on December 5, 2010, depict marks on the

window frame, which further support his testimony. Furthermore, as the trial court noted, the cash taken from the restaurant was evidence that could have easily been destroyed. *Id.*

Defendant argues that the police had no basis to believe that the fleeing suspect was armed and dangerous. He emphasizes that the theft at Jackie's Diner was not an armed robbery. It was a taking of cash from an unattended cash register without a weapon or threats. However, Officers Pung and Terrill testified that the initial radio dispatch to Jackie's Diner indicated that a larceny *or robbery* had occurred. Also, the police had information from Officer Terrill about the anonymous tip that the person who had committed several armed robberies in the area was staying at Apartment 104 of the Dorchester apartments. That fact gave the police reason to be concerned about weapons in Apartment 104, regardless of whether the Jackie's Diner suspect used a weapon and regardless of whether the police believed that that person was the same person who committed the armed robberies.

The hearing on remand addressed the questions and concerns we raised in our prior opinion. Relevant items that previously were outside the record and not appropriate for consideration were admitted at the hearing and are now part of the record. The trial court's findings were detailed, thorough, and supported by the testimony and exhibits at the hearing. The trial court did not clearly err by making its findings of fact nor did it err by concluding that the entry without a warrant was lawful.

## II. INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant argues that his trial counsel rendered ineffective assistance.

Whether a defendant was deprived of the effective assistance of counsel presents a mixed question of fact and constitutional law. *People v LeBlanc*, 465 Mich 575, 579; 640 NW2d 246 (2002). We review the trial court's factual findings, if any, for clear error, while constitutional determinations are reviewed de novo. *Id.*

In order to demonstrate that he or she was denied the effective assistance of counsel under either the federal or the state constitution, a defendant must, first, show that trial counsel's performance was "deficient" and, second, show that the "deficient performance prejudiced the defense." *People v Carbin*, 463 Mich 590, 599-600; 623 NW2d 884 (2001) (quotation marks and citation omitted). "To demonstrate prejudice, the defendant must show the existence of a reasonable probability that, but for counsel's error, the result of the proceeding would have been different." *Id.* at 600.

Defendant argues that counsel was ineffective for failing to move to suppress evidence the police seized in the apartment following the entry without a warrant. As discussed already, the entry without a warrant was lawful and a motion to suppress evidence obtained as a result of the entry would have been futile. Counsel is not ineffective for failing to advance a meritless position or make a futile motion. *People v Fonville*, 291 Mich App 363, 384; 804 NW2d 878 (2011).

In a Standard 4 brief, see Administrative Order No. 2004-6, 471 Mich c (2004), defendant contends that counsel was ineffective as a result of failing to make "mandatory pre-investigations," failing to locate and question alibi witnesses, and failing to make "appropriate objections." However, defendant fails to articulate, and the record does not reveal, what "pre-investigations" counsel should have made or who the alleged alibi witnesses were, what testimony they could

have offered, or how their testimonies would have made any impact at trial. Similarly, defendant does not articulate what objections counsel should have made or how any additional objections would have affected the outcome of the proceeding. Accordingly, defendant has abandoned his argument for review. See *People v Kelly*, 231 Mich App 627, 640-641; 588 NW2d 480 (1998) ("An appellant may not merely announce his position and leave it to this Court to discover and rationalize the basis for his claims, nor may he give only cursory treatment with little or no citation of supporting authority.").

### III. SUFFICIENCY OF THE EVIDENCE

Defendant contends that there was insufficient evidence to support his conviction for the November 20, 2010, robbery at the L & L Gas Express.[4] Specifically, defendant contends that the prosecution failed to prove that he assaulted Kelly Buell, the gas station attendant.

We review de novo a challenge to the sufficiency of the evidence. *People v Ericksen*, 288 Mich App 192, 195; 793 NW2d 120 (2010). In conducting our review, we review the evidence in the light most favorable to the prosecution to determine whether "a rational trier of fact could find that the evidence proved the essential elements of the crime beyond a reasonable doubt." *People v Harverson*, 291 Mich App 171, 175; 804 NW2d 757 (2010).

"The essential elements of an armed robbery are (1) an assault, and (2) a felonious taking of property from the victim's person or presence, while (3) the defendant is armed with a weapon described in the statute."

---

[4] This offense was Count 7 of Ingham Circuit Court File No. 10-001265-FC.

*People v Allen*, 201 Mich App 98, 100; 505 NW2d 869 (1993). "The offense of assault requires proof that the defendant made either an attempt to commit a battery or an unlawful act that places another in reasonable apprehension of receiving an immediate battery." *People v Watkins*, 247 Mich App 14, 33; 634 NW2d 370 (2001). A battery is "an intentional, unconsented and harmful or offensive touching of the person of another, or of something closely connected with the person." *People v Starks*, 473 Mich 227, 234; 701 NW2d 136 (2005) (citations and quotation marks omitted).

Here, defendant argues that there was insufficient evidence to show that he attempted to commit a battery against Buell or that he put Buell in reasonable apprehension of being battered. Buell testified that defendant stated "give it to me," and then when she asked for clarification he said, "you know the deal. Give me the money. Hurry up, you have two seconds." Buell testified that she knew about the prior robberies and that she understood what defendant meant when he stated, "you know the deal." A trier of fact could have concluded that it was reasonable for Buell to infer that defendant was referring to the previous robberies when he stated, "you know the deal," and that defendant was threatening violence when he told Buell that she had "two seconds." The fact that Buell did not see the scissors defendant was carrying until he was leaving the building would not preclude a rational juror from finding that Buell had a reasonable fear or apprehension of an offensive touching if she did not comply with defendant's demand. *Watkins*, 247 Mich App at 33. Moreover, Buell testified that she was afraid defendant was going to come back because she only gave him a small amount of money and her purse was on the counter. In sum, there was sufficient evidence to allow a

rational juror to convict defendant of committing the armed robbery on November 20, 2010, beyond a reasonable doubt.

### IV. WAIVER OF *MIRANDA* RIGHTS

Defendant next argues that the trial court erred by allowing the prosecutor to introduce evidence of statements he made to the police during a custodial interrogation. Defendant contends that the waiver he signed during the interrogation was invalid because the police did not scrupulously honor his unambiguous assertion of his right to remain silent. Defendant preserved this issue for review by filing a pretrial motion to suppress the statements. *People v Aldrich*, 246 Mich App 101, 113; 631 NW2d 67 (2001).

"Statements of an accused made during custodial interrogation are inadmissible unless the accused voluntarily, knowingly, and intelligently waived his or her Fifth Amendment rights." *People v Gipson*, 287 Mich App 261, 264; 787 NW2d 126 (2010), citing *Miranda v Arizona*, 384 US 436, 444; 86 S Ct 1602; 16 L Ed 2d 694 (1966). "We review de novo a trial court's determination that a waiver was knowing, intelligent, and voluntary." *Gipson*, 287 Mich App at 264. However, we review a trial court's factual findings on a motion to suppress for clear error. *Hyde*, 285 Mich App at 436. To the extent we find that constitutional error has occurred, "[w]e review preserved issues of constitutional error to determine whether they are harmless beyond a reasonable doubt." *People v Dendel (On Second Remand)*, 289 Mich App 445, 475; 797 NW2d 645 (2010). "A constitutional error is harmless if [it is] clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error." *Id.* at 475 (quotation marks and citations omitted).

A criminal defendant enjoys safeguards against involuntary self-incrimination during custodial interrogations. *Michigan v Mosley*, 423 US 96, 99-100; 96 S Ct 321; 46 L Ed 2d 313 (1975); *Miranda*, 384 US at 444. Included within these safeguards is the right to remain silent during custodial interrogation and the right to cut off police questioning. *Mosley*, 423 US at 103-104. A defendant may assert his or her right to remain silent at any time, *id.* at 100, however, the assertion must be unequivocal. *People v Davis*, 191 Mich App 29, 36; 477 NW2d 438 (1991). When a defendant invokes his or her right to remain silent, the police must "scrupulously honor" the defendant's request. *Mosley*, 423 US at 103-104. The police fail to "scrupulously honor" a defendant's invocation of the Fifth Amendment right "by refusing to discontinue the interrogation upon request or by persisting in repeated efforts to wear down his resistance and make him change his mind." *Id.* at 105-106.

> If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise. [*Id.* at 100.]

In this case, the police read defendant his *Miranda* rights and defendant acknowledged that he understood those rights. The police then had the following exchange with defendant:

> [*Detective Kim Kranich*]: Okay. So you understand everything that I read to you?
>
> [*Defendant*]: Yes.
>
> [*Detective*]: Okay. Are you willing to give up those rights and make a statement to us at this time? Talk to us about what we're, talk to us about what we're doing?

[*Defendant*]: *No sir.*

[*Detective*]: So you don't wanna talk to us?

[*Defendant*]: I mean you say give up the rights.

[*Detective*]: Well no, do you wanna give us, give us a statement at this time? You understand what I read to you.

[*Defendant*]: Yeah.

[*Detective*]: Those are all your rights.

[*Defendant*]: Yeah.

[*Detective*]: Now I'm asking do you wanna make a statement at this time, what we wanna talk to you about?

\* \* \*

[*Defendant*]: Yeap, yes. I understand what you're saying. Yeah, yeah.

[*Detective*]: Okay, okay. You wanna make a statement then and talk to us.

[*Defendant*]: Yes, I'll make a statement yeah.

[*Detective*]: Okay.

[*Defendant*]: *But I'm not give* [sic] *up my rights am I?*

\* \* \*

[*Detective Steven McClean*]: If you're uncomfortable about something or if you just simply don't like us, you can say I'm done, okay. You can interrupt us for that matter, it's no big deal. We just wanna set the matter straight. This has been coming on for some time.

[*Defendant*]: Okay. [Emphasis added.]

Defendant then signed a waiver form, waiving his rights, and then made incriminating statements. The trial court denied defendant's motion to suppress the statements, holding that defendant knowingly waived his Fifth Amendment rights.

Having reviewed the record, we conclude that the trial court erred by holding that defendant unequivocally waived his Fifth Amendment right to remain silent. After the police read defendant his rights and asked him if he was willing to "give up those rights and make a statement," defendant unequivocally stated "No sir." In doing so, defendant asserted his Fifth Amendment right to remain silent.[5] See *Berghuis v Thompkins*, 560 US 370, 382; 130 S Ct 2250; 176 L Ed 2d 1098 (2010) (a defendant can unambiguously assert the right to remain silent by stating that "he did not want to talk with the police").

Instead of scrupulously honoring defendant's assertion of his Fifth Amendment right to remain silent, the police sought to assure defendant that he would not be giving up his rights by making a statement. Specifically, when defendant stated, "you say give up the rights," the detective responded, "Well *no*, do you wanna give us, give us a statement at this time?" (Emphasis added). The detective informed defendant that his rights were on the form; then stated, "Now I'm asking do you wanna make a statement at this time, what we wanna talk to you about?" In doing so, the police distinguished

---

[5] The dissent contends that defendant did not unequivocally assert his Fifth Amendment right to remain silent when he responded, "No, sir," when the police asked him if he was willing to give up his rights and make a statement. Notably, the dissent fails to articulate what part of the word "no" is equivocal. This is because there is nothing about the word "no" that is equivocal. "Equivocal" is defined, in relevant part, as "allowing the possibility of more than one meaning or interpretation . . . ambiguous." *Random House Webster's College Dictionary*, (1997). The dissent fails to explain how responding "no" to a question allows for the possibility of more than one meaning or how it is deliberately ambiguous. For example, the dissent does not articulate what part of the word "no" means "yes," "maybe," "possibly," or "perhaps." Presumably this is because the word "no" is unambiguous. See *id.* (defining "no," in relevant part, as "a negative expressing . . . denial, or refusal, as in response to a question or request . . . a denial or refusal").

the act of making a statement from the act of waiving the right to remain silent, when in fact, the two are inextricably linked. Indeed, before signing the waiver, defendant again sought assurance that he was not giving up his rights when he stated, "But I'm not give [sic] up my rights am I?" This response showed that defendant believed that he could make a statement without waiving his Fifth Amendment rights. The police did not respond by accurately informing defendant that by agreeing to talk, he was, in fact, waiving his Fifth Amendment rights. Instead, the police informed defendant that he could stop talking if he wanted to. In doing so, the police concealed from defendant the fact that agreeing to talk constituted a waiver of his constitutional rights. Only then did defendant agree to talk with the police and sign the waiver form. Because the police failed to scrupulously honor defendant's initial assertion of his right to remain silent, and because the police subsequently led defendant to believe that he was not relinquishing his rights by agreeing to make a statement, the trial court erred by concluding that defendant knowingly and intelligently waived his Fifth Amendment rights. *Mosley*, 423 US at 100; *Miranda*, 384 US at 479.

Nevertheless, while the trial court erred by admitting defendant's statements, we conclude that, given the untainted evidence in this particular case, admission of the statements was harmless beyond a reasonable doubt. *Dendel*, 289 Mich App at 475.

The admission of the incriminating statements as it related to the November 17 and November 20, 2010 robberies amounted to harmless error. Here, both victims of the robberies identified defendant as the perpetrator at trial. Richard Mellott, the gas station attendant who was robbed on November 17, and Buell

testified that they saw defendant's face during the robberies. Mellott testified that defendant wore a dark-colored coat with fur trim and Buell testified that defendant wore a gray hooded sweatshirt. The police found a similar coat and a gray/brown reversible hooded sweatshirt in the apartment that defendant occupied at the time of his arrest. As discussed already, this evidence was not obtained in violation of defendant's Fourth Amendment rights. Further, Buell identified defendant in a police photographic array, stating that he was 90% certain that defendant was the robber. Independent of the police interview, this evidence standing alone was more than enough evidence for a jury to find beyond a reasonable doubt that defendant committed these robberies.

Similarly, the admission of the incriminating statements as it related to the December 2, 2010 Quality Dairy robbery was harmless error. *Id.* Tamara Miller and Taylor Hatz, the clerks, both testified that they could see defendant's face during the robbery and they both testified that defendant committed the robbery. Berkley Watson, a customer, also identified defendant as an individual who was in the store at about the time of the robbery. In addition, Miller testified that defendant wore a dark hooded sweatshirt and Hatz testified that defendant wore a textured dark hooded sweatshirt. The police found a textured brown hooded sweatshirt in the apartment defendant occupied at the time of his arrest and an expert testified that the sweatshirt was probably the same one depicted on a surveillance video from the Quality Dairy.

With respect to the November 16 and December 2, 2010 L & L robberies, although Christopher Selover, the gas station attendant, did not identify defendant at trial, there was other significant evidence that would

have allowed the jury to convict defendant beyond a reasonable doubt. Selover testified that the same man robbed him on November 16 and December 2. Selover testified that the perpetrator wore a black puffy coat on November 16, and the police found a black puffy coat in the apartment defendant occupied at the time of his arrest. Selover testified that the perpetrator wore a stocking cap with a small visor on it, which was similar to the hat that Mellott testified that defendant wore during the November 17 robbery. Selover testified that the perpetrator wore a camouflage coat with fur trim on December 2, and the police recovered a similar coat in the apartment where defendant was arrested. An expert testified that he was 99% sure that the coat found in the apartment matched the coat depicted in a surveillance video of the robbery and he identified nine unique matching characteristics. Furthermore, Selover testified that the perpetrator had previously entered the store wearing a dark-colored ice company uniform. David Bismack, the Lansing district manager for the Arctic Glacier Ice Company, testified that defendant had previously worked for Arctic Glacier, where he made deliveries and wore a dark-colored shirt with the company's name on it.

In addition, the man who committed the November 16 robbery used the same modus operandi as the man who robbed Mellott in the same store on November 17. Mellott testified that defendant was the man who entered the store, asked for a Black & Mild brand cigar, and then pointed a gun and demanded money as Mellott turned to give defendant the cigar. Similarly, Selover testified that the man who robbed him on November 16 used the identical method to rob him. Selover testified that the man had a silver handgun and Mellott testified that defendant used a black and silver handgun. Furthermore, Selover testified that, during the December 2 robbery, the

perpetrator stated, "you know what the f------ deal is," which would allow a juror to infer that the man was the same man who had previously robbed Mellott and Buell —i.e., defendant, in accordance with their identification testimony. Finally, Selover testified that the perpetrator went toward the Dorchester apartments after the December 2 robbery, the apartment complex that was close to the L & L Gas Express and where the police ultimately arrested defendant several days later.

In sum, defendant is not entitled to reversal because admission of defendant's statements was harmless since it is "clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error." *Dendel*, 289 Mich App at 475 (quotation marks and citations omitted).

### V. RIGHT OF CONFRONTATION

Defendant raises two issues in a Standard 4 brief with respect to a confidential informant that the police relied on during their investigation. Specifically, before trial, defendant moved to compel the prosecution to disclose the identity of the confidential informant. The trial court denied the motion.

At trial, Detective Steven McClean testified that at the outset of his investigation, he spoke with the confidential informant. McClean testified that the informant "came forward with the defendant's name." However, following a defense objection that the testimony contained hearsay statements, the prosecutor withdrew the question. The trial court did not provide a curative instruction. McClean then testified that based on his conversations with the informant, he came to believe that defendant was responsible for the November 16 and November 17 robberies. McClean testified

that he provided the informant $200 for "his assistance
in both identifying the person involved and also for his
assistance in locating him." McClean testified that after
he formed an opinion regarding who was responsible for
the first two L & L robberies, he prepared photographic
lineups to present to the victims. The trial court allowed
the testimony over defense counsel's hearsay objection
on the ground that it was admissible to show how
McClean proceeded with his investigation. During clos-
ing and rebuttal arguments, the prosecutor stated that
there was significant identification evidence beyond
that which the informant provided. Otherwise, the
prosecutor did not refer to the informant.

Defendant initially contends that he was denied the
right to confront the informant and thereby denied a
fair trial.

Defendant failed to preserve this issue for review
because he did not object on the same basis in the trial
court. *People v Grant*, 445 Mich 535, 545, 553; 520
NW2d 123 (1994). Whether defendant was denied his
right of confrontation involves a question of constitu-
tional law that we review de novo. *People v Fackelman*,
489 Mich 515, 524; 802 NW2d 552 (2011). We review
unpreserved constitutional issues for plain error affect-
ing defendant's substantial rights. *People v Carines*, 460
Mich 750, 763, 774; 597 NW2d 130 (1999). Under the
plain-error rule, a defendant must show: "1) error . . .
occurred, 2) the error was plain, i.e., clear or obvious, 3)
and the plain error affected substantial rights." *Id*. at
763. To show that an error affected substantial rights, a
defendant must show that "the error affected the
outcome of the lower court proceedings." *Id*. If a defen-
dant satisfies these three requirements, "[r]eversal is
warranted only when the plain, forfeited error resulted
in the conviction of an actually innocent defendant or

when an error seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings' independent of the defendant's innocence." *Id.* at 763 (quotation marks and citation omitted).

The Confrontation Clause of the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted by the witnesses against him[.]" US Const, Am VI. The Michigan Constitution also affords a defendant this right of confrontation. Const 1963, art 1, § 20; *Fackelman*, 489 Mich at 525. The Confrontation Clause concerns out-of-court statements of witnesses, that is, persons who bear testimony against the defendant. *Id.* at 528.

"As a rule, if an out-of-court statement is testimonial in nature, it may not be introduced against the accused at trial unless the witness who made the statement is unavailable and the accused has had a prior opportunity to confront that witness." *Bullcoming v New Mexico*, 564 US ___, ___; 131 S Ct 2705, 2713; 180 L Ed 2d 610, 619 (2011). "To rank as 'testimonial,' a statement must have a 'primary purpose' of 'establish[ing] or prov[ing] past events potentially relevant to later criminal prosecution.' " *Id.* 564 US at ___ n 6; 131 S Ct at 2714 n 6; 180 L Ed 2d at 620 n 6, quoting *Davis v Washington*, 547 US 813, 822; 126 S Ct 2266; 165 L Ed 2d 224 (2006). The constitutional concern is out-of-court statements of witnesses, that is, persons "who bear testimony against a defendant." *Fackelman*, 489 Mich at 528.

A statement by a confidential informant to the authorities generally constitutes a testimonial statement. However, the Confrontation Clause does not bar the use of out-of-court testimonial statements for purposes other than establishing the truth of the matter asserted. Thus, a statement offered to show the effect of the out-of-court statement on the hearer does not violate the Confrontation

Clause. Specifically, a statement offered to show why police officers acted as they did is not hearsay. [*People v Chambers*, 277 Mich App 1, 10-11; 742 NW2d 610 (2007) (citations omitted).]

In this case, McClean's testimony regarding the confidential informant's out-of-court statements was improper. McClean testified that the confidential informant "came forward with the defendant's name," and that he came to believe that defendant was responsible for the November 16 and November 17 robberies on the basis of what the informant said, necessarily implying that the informant implicated defendant in the robberies. This testimony was not limited to show why McClean proceeded in a certain direction with his investigation. *Id.* Instead, the testimony necessarily implied that the informant accused defendant of the first two robberies and that McClean considered the informant credible. The primary purpose of these statements was to "establish[] or prov[e] past events potentially relevant to later criminal prosecution," and as such, they were testimonial in nature. *Bullcoming*, 564 US at ___ n 6; 131 S Ct at 2714 n 6; 180 L Ed 2d at 620 n 6 (quotation marks and citation omitted). Therefore, because defendant did not have a prior opportunity to cross-examine the informant, admission of the out-of-court statements was improper. *Id.* 564 US at ___; 131 S Ct at 2713; 180 L Ed 2d at 619. Had McClean limited his testimony to an explanation that, on the basis of the information he received from the informant he proceeded in a certain direction with his investigation, it may have been admissible. See *Chambers*, 277 Mich App at 10-11. And, although the prosecutor "withdrew" his question regarding whether the informant identified the perpetrator, this did not cure the taint of the testimony because the trial court failed to instruct the jury not to consider McClean's response. See *People v*

*Crawford*, 458 Mich 376, 399 n 16; 582 NW2d 785 (1998) (noting that, "a limiting instruction will often suffice to enable the jury to compartmentalize evidence and consider it only for its proper purpose . . . .") Nevertheless, defendant cannot show that the improper testimony affected his substantial rights because he cannot show that it affected the outcome of the lower court proceedings. *Carines*, 460 Mich at 763-764.

In this case, as discussed already, there was significant evidence that would allow a juror to convict defendant. Specifically, in regard to three of the five robberies, the victims testified that defendant was the perpetrator. In regard to the other two robberies, the perpetrator utilized the same modus operandi. In addition, Selover testified that the person who robbed him previously entered the store wearing an ice company uniform, and the evidence showed that defendant had previously worked for Arctic Glacier, a Lansing-area ice company, and had delivered ice to businesses while wearing the company's uniform. Additionally, the police recovered clothing from the apartment where defendant was arrested that matched the clothing the perpetrator wore during the robberies. Finally, the prosecutor did not emphasize the informant's statements during closing or rebuttal argument. On this record, defendant cannot show that the improper aspects of McClean's testimony affected the outcome of the proceedings and, therefore, he is not entitled to a new trial on this basis. *Id*.

### VI. DISCLOSURE OF THE CONFIDENTIAL INFORMANT

Next, in a supplemental Standard 4 brief, defendant argues that the trial court abused its discretion by denying his request to produce the informant. Defendant also argues that the identity of the confidential

informant was material evidence that the prosecutor was obligated to disclose under *Brady v Maryland*, 373 US 83; 83 S Ct 1194; 10 L Ed 2d 215 (1963).

We review a trial court's decision whether to order production of a confidential informant for an abuse of discretion. *People v Poindexter*, 90 Mich App 599, 608; 282 NW2d 411 (1979). "An abuse of discretion occurs when the court chooses an outcome that falls outside the range of reasonable and principled outcomes." *People v Mahone*, 294 Mich App 208, 212; 816 NW2d 436 (2011). "This Court reviews de novo a defendant's claim of a constitutional due-process violation." *People v Jackson*, 292 Mich App 583, 590; 808 NW2d 541 (2011).

"Generally, the people are not required to disclose the identity of confidential informants." *People v Cadle*, 204 Mich App 646, 650; 516 NW2d 520 (1994), overruled in part on other grounds *People v Perry*, 460 Mich 55, 64-65; 594 NW2d 477 (1999). However, when a defendant demonstrates a possible need for the informant's testimony, a trial court should order the informant produced and conduct an in camera hearing to determine if the informant could offer any testimony beneficial to the defense. *People v Underwood*, 447 Mich 695, 705-706; 526 NW2d 903 (1994). Whether a defendant has demonstrated a need for the testimony depends on the circumstances of the case and a court should consider "the crime charged, the possible defenses, the possible significance of the informer's testimony, and other relevant factors." *Id.* at 705 (quotation marks and citation omitted).

In this case, the trial court did not abuse its discretion by finding that defendant failed to demonstrate a need for the informant's testimony. Defendant fails to indicate how disclosure of the informant's identity would have been beneficial to his

defense. Here, even assuming defendant had access to the informant and called him as a witness at trial, the jury learned that the informant was paid for providing information and defendant cannot otherwise articulate how calling the informant at trial would have affected the outcome of the proceedings. While the informant gave information to the police that caused the police to focus their investigation on defendant, the witnesses who identified defendant from the crime scene were not basing their identifications on information from the informant. Rather, the witnesses identified defendant on the basis of their own observations at the time of the robberies. In short, the informant would not have offered any material or exculpatory evidence and the trial court did not abuse its discretion by denying defendant's motion to produce the informant.

Similarly, defendant cannot show that the failure to produce the informant amounted to a *Brady* violation. The prosecution's failure to disclose exculpatory or material evidence in its possession constitutes a due process violation regardless of whether a defendant requested the evidence. *Brady*, 373 US at 87; *Jackson*, 292 Mich App at 590–591. "[U]ndisclosed evidence will be deemed material only if it 'could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.' " *People v Lester*, 232 Mich App 262, 282; 591 NW2d 267 (1998), overruled on other grounds *People v Chenault*, 495 Mich 142, 146 (2014), quoting *Kyles v Whitley*, 514 US 419, 435; 115 S Ct 1555; 131 L Ed 2d 490 (1995). Here, as discussed already, the informant would not have offered material or exculpatory evidence and failure to produce the informant did not undermine confidence in the verdict. Accordingly, there was no *Brady* violation.

VII. ARRAIGNMENT

In his supplemental Standard 4 brief, defendant argues that the trial court lacked subject-matter jurisdiction because defendant signed a waiver of arraignment before the preparation and filing of the information.

Defendant failed to preserve this issue for review because he did not raise it in the trial court. *Grant*, 445 Mich at 545. To obtain relief, defendant must show plain error that affected his substantial rights. *Carines*, 460 Mich at 763-764.

Defendant, represented by counsel, waived arraignment on December 29, 2010. On the waiver form, defendant acknowledged having reviewed the information and that he understood the nature of the charges against him. The information indicates that it was filed on January 12, 2011 (i.e., after defendant waived arraignment). Defendant contends that his waiver was invalid under MCR 6.113(B), which requires the prosecutor to "give a copy of the information to the defendant before the defendant is asked to plead." Defendant argues that the prosecutor could not have provided him a copy of the information before he waived arraignment because that document was not filed until after the waiver.

"The purpose of an arraignment is to provide formal notice of the charge against the accused." *People v Waclawski*, 286 Mich App 634, 704; 780 NW2d 321 (2009). In this case, although the information may have been filed in court after defendant waived arraignment, the record supports the conclusion that defendant had an opportunity to review the information before it was filed. Specifically, on the waiver form defendant acknowledged that he had read the information and understood the charges against him. Merely because

the prosecutor had not filed the information did not deprive defendant of the opportunity to review the information before he waived the arraignment. In addition, defendant attended the preliminary examination in this case. Thus, defendant was aware of the charges against him even though the trial court did not hold an arraignment. Accordingly, defendant cannot show prejudice. See *People v Nix*, 301 Mich App 195, 208; 836 NW2d 224 (2013) ("A showing of prejudice is required to merit relief for the failure to hold a circuit court arraignment.").

Defendant argues that the invalid waiver deprived the circuit court of subject-matter jurisdiction. This argument lacks merit. "Subject matter jurisdiction concerns a court's abstract power to try a case of the kind or character of the one pending and *is not dependent on the particular facts of the case.*" *People v Lown*, 488 Mich 242, 268; 794 NW2d 9 (2011) (quotation marks, citations, and some emphasis omitted). Here, the trial court had subject-matter jurisdiction over defendant. See Const 1963, art 6, §§ 1 and 13; MCL 600.151; MCL 600.601; MCL 767.1.

### VIII. DUE PROCESS

Finally, in his supplemental Standard 4 brief, defendant argues that the police used "improper and unjust" identification methods during their investigation that violated his due process rights.

During his investigation, Detective McClean presented photographic lineups to Selover and Buell individually. Neither Selover nor Buell identified defendant in the first lineup. McClean then displayed a second lineup to Selover using a more recent photograph of defendant. The photographs in this second lineup were small. When Selover could not identify defendant, McClean showed Selover a

large photograph of defendant and Selover identified defendant as the perpetrator with "100-percent" certainty. McClean then displayed another lineup to Buell using six large photographs including the large photograph of defendant. Buell identified defendant with "90-percent" certainty.

Defendant moved to suppress the identification testimony on the ground that the procedure was unduly suggestive. Following an evidentiary hearing, the trial court suppressed Selover's identification testimony and refused to allow Selover to identify defendant at trial. The court reasoned that McClean tainted the second photographic lineup he showed to Selover when he displayed a large photograph of defendant next to small photographs of five other individuals. With respect to Buell, the trial court held that "the issue is nonexistent. She was never shown just one photograph. She was shown a collection of six large photographs and made an identification based on that." At trial, Buell testified that she identified defendant in the photograph lineup and she identified defendant in court as the person who robbed her.

On appeal, defendant contends that the trial court erred. We review de novo a trial court's ruling on a motion to suppress evidence. *Williams*, 472 Mich at 313. The trial court's factual findings are reviewed for clear error, *Hyde*, 285 Mich App at 436, and the underlying constitutional issues are reviewed de novo. *Gillam*, 479 Mich at 260. To the extent that defendant raises issues that were not raised in the trial court, we review unpreserved constitutional issues for plain error affecting defendant's substantial rights. *Carines*, 460 Mich at 763-764.

"A photographic identification procedure or lineup violates due process guarantees when it is so impermis-

sibly suggestive as to give rise to a substantial likelihood of misidentification." *People v McDade*, 301 Mich App 343, 357; 836 NW2d 266 (2013). The suggestiveness of a photographic lineup must be examined in light of the totality of the circumstances. *Id.*

> As a general rule, physical differences between a suspect and other lineup participants do not, in and of themselves, constitute impermissible suggestiveness . . . . Differences among participants in a lineup are significant only to the extent they are apparent to the witness and substantially distinguish defendant from the other participants in the line-up. . . . It is then that there exists a substantial likelihood that the differences among line-up participants, rather than recognition of defendant, was the basis of the witness' identification. [*People v Kurylczyk*, 443 Mich 289, 312; 505 NW2d 528 (1993) (opinion by GRIFFIN, J.) (quotation marks and citations omitted).]

Here, the only evidence of the photographic lineups admitted at trial concerned the lineups shown to Buell. Defendant has failed to articulate how those lineups were unduly suggestive. McClean showed Buell a lineup of six large photographs of individuals, including one of defendant. Buell identified defendant as the perpetrator. There was nothing about this lineup that was unduly suggestive. Buell explained that the photographs were all large, page-sized photographs of individuals. Defendant does not indicate any unique differences about his photograph that served to make the lineup unduly suggestive and there are none apparent on the record before us. Therefore, we cannot conclude that the trial court clearly erred by allowing Buell to offer identification testimony at trial.

Defendant raises several other ancillary arguments. He contends that the trial court erred by refusing to allow him to introduce evidence of the improper method McClean used in administering the lineup to Selover.

However, had the court allowed that information, the jury would have been informed that Selover identified defendant in the lineup. This would have prejudiced defendant, and he moved, successfully, to exclude the evidence on that basis. He cannot now claim that the trial court erred by granting him the relief he requested. See *People v Buie*, 491 Mich 294, 312; 817 NW2d 33 (2012) (a defendant cannot harbor error as an appellate parachute). Moreover, the trial court did allow defendant to cross-examine the witnesses regarding their inability to identify defendant in the photographic arrays and defendant's argument to the contrary lacks merit.

Defendant also argues that the identification procedure was improper because his name and photograph were broadcast on television before the preliminary examination. This argument fails. While Selover testified at the preliminary examination that he saw defendant's photograph on television, Selover was precluded from identifying defendant at trial. Nothing in the record supports that Buell saw defendant on television. Defendant has failed to show error.

IX. CONCLUSION

Having reviewed the record, we conclude that, given the particular facts of this case, defendant was not denied his Fourth Amendment right to privacy or his Sixth Amendment right to the effective assistance of counsel. Additionally, there was sufficient evidence to support the jury's conviction with regard to the November 20, 2010 armed robbery, the trial court did not err by denying defendant's motion to produce the confidential informant, defendant was not prejudiced when he waived the arraignment, and defendant was not denied due process with respect to the identification testimony.

However, the trial court erred in concluding that defendant waived his *Miranda* rights and McClean's testimony concerning out-of-court statements made by an informant was improper and violated the Confrontation Clause. Nevertheless, on the specific record before us, for the reasons set forth in this opinion, we cannot conclude that these errors warrant reversal and a new trial.

Affirmed.

M. J. KELLY, J., concurred with BORRELLO, P.J.

BOONSTRA, J. (*concurring in part and dissenting in part*). I concur fully with Parts I, II, III, and V to VIII of the majority opinion, and to the corresponding portions of its concluding Part IX. I also concur with the result reached in Part IV of the majority opinion and in the corresponding portion of its Part IX. Where I respectfully part company with the majority is in its holding that the trial court erred, even harmlessly, by admitting into evidence defendant's statements to the police detectives. To that extent, I respectfully dissent. I write separately to detail why I would find that no *Miranda*[1] violation occurred here.

### I. BACKGROUND OF *MIRANDA*

"No person . . . shall be compelled in any criminal case to be a witness against himself . . . ." US Const, Am V; accord Const 1963, art 1, § 17. The genesis of that fundamental constitutional protection lies in the " 'iniquities of the ancient system' " of "inquisitorial and manifestly unjust methods of interrogating accused

[1] *Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

persons," including by "resort[ing] to physical brutality—beating, hanging, whipping—and to sustained and protracted questioning incommunicado in order to extort confessions." *Miranda v Arizona*, 384 US 436, 442-443, 446; 86 S Ct 1602; 16 L Ed 2d 694 (1966) (quotation marks and citations omitted).

The *Miranda* procedures are a now-familiar judicially created mechanism for protecting this constitutional right "not to be compelled to incriminate" oneself against what a majority of the United States Supreme Court termed "overzealous police practices." *Id.* at 439, 444. The Court recognized that, by the time of the adoption of the *Miranda* procedures in 1966, the modern police practices with which they were concerned had become less those of physical brutality and more in the nature of psychological coercion. *Id.* at 448. The *Miranda* Court thus described its concern as being with the "interrogation atmosphere and the evils it can bring." *Id.* at 456. Stated differently, "the *Miranda* warning procedures protect against the coercion that can occur when a citizen is suddenly engulfed in a police-dominated environment." *People v Cortez (On Remand)*, 299 Mich App 679, 702; 832 NW2d 1 (2013) (O'CONNELL, P.J., concurring). The Supreme Court recently has described the following as the typical scenario that triggers the *Miranda* procedures:

> [A] person is arrested in his home or on the street and whisked to a police station for questioning—detention represents a sharp and ominous change, and the shock may give rise to coercive pressures. A person who is cut off from his normal life and companions and abruptly transported from the street into a police-dominated atmosphere may feel coerced into answering questions. [*Howes v Fields*, 565 US ___, ___; 132 S Ct 1181, 1190; 182 L Ed 2d 17, 29 (2012) (quotation marks and citations omitted).]

## II. "CUSTODIAL INTERROGATION"

The *Miranda* Court thus created certain safeguards to protect individuals from excesses that might occur in the "police-dominated" "interrogation atmosphere."[2] As the Court explained, however, those safeguards apply only in the context of "custodial interrogation":

> Our holding . . . briefly stated . . . is this: the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way. [*Miranda*, 384 US at 444.]

"Custodial interrogation" obviously has two components: (1) custody and (2) interrogation. Custody is not at issue in this case, because it is undisputed here that defendant was in custody.[3]

---

[2] The *Miranda* Court stressed, however, that it did not intend to create a "constitutional straightjacket" or to "hamper the traditional function of police officers in investigating crime." *Miranda*, 384 US at 467, 477. Nor, the Court clarified, did the constitution require "any specific code of procedures for protecting the privilege against self-incrimination during custodial interrogation. Congress and the States are free to develop their own safeguards for the privilege, so long as they are fully as effective as those described above in informing accused persons of their right of silence and in affording a continuous opportunity to exercise it." *Id.* at 490.

[3] Since *Miranda*, the Supreme Court has clarified that "[n]ot all restraints on freedom of movement amount to custody for purposes of *Miranda.*" *Fields*, 565 US at ___; 132 S Ct at 1189; 182 L Ed 2d at 28. The question of "custody" instead further turns on "the additional question whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda.*" *Id.* at ___; 132 S Ct at 1190; 182 L Ed 2d at 28. The courts thus have recently grappled, for example, with whether the questioning of prisoners

The relevant question here, therefore, is whether the detectives engaged in improper interrogation of defendant in violation of *Miranda*. I would hold that they did not.

### A. DEFENDANT RECEIVED THE REQUISITE *MIRANDA* WARNINGS

As the majority acknowledges, defendant was read his rights and acknowledged that he understood them. To give proper context to what occurred thereafter, it is worth reviewing the rights that the detectives read to defendant. The record reflects the following recitation of rights and related colloquy with defendant:

> [*Detective Kim Kranich*]: What time you got? I don't — About 6:45. Okay. I'm gonna read these to you and I want you to answer me yes or no, okay. You have the right to remain silent. You do not have to talk to anyone and you do not have to answer any questions. Do you understand that one?
>
> [*Defendant*]: Yes.
>
> [*Detective*]: Anything you say can and will be used as evidence ... excuse me. Anything you say can and will be used against you in a court of law.
>
> [*Defendant*]: Yeah.
>
> [*Detective*]: You have the right to speak to an attorney but you have the ... attorney present while during questions ... Jesus crimeney, the light here ... You have the right to speak to an attorney and have an attorney present while you're being questioned. Do you understand that one?
>
> [*Defendant*]: Yes sir.
>
> [*Detective*]: If you want an attorney but cannot afford one, an attorney will be appointed to represent you at public expense before answering any questions. Understand that one?

necessarily is "custodial" for purposes of *Miranda*. See, e.g., *id.* at ___; 132 S Ct at 1190; 182 L Ed 2d at 28-29; *Cortez*, 299 Mich App at 699-701 (opinion by METER, J.), 701-703 (O'CONNELL, P.J., concurring).

[*Defendant*]: Yeap.

[*Detective*]: If you give up your right to remain silent you may at any time change your mind and stop talking and stop answering questions. Do you understand that one Randall?

[*Defendant*]: Yeah.

[*Detective*]: If you give up your right to an attorney you may at any time change your mind and ask to speak to an attorney. Understand all of those ones, six things I read to ya?

[*Defendant*]: Yes.

### B. THE CONTEXT OF DEFENDANT'S SUBSEQUENT EXCHANGE WITH THE DETECTIVES REVEALS CONFUSION, NOT AN UNEQUIVOCAL INVOCATION OF DEFENDANT'S RIGHT TO REMAIN SILENT

The detectives then had the following initial exchange with defendant:

[*Detective Kranich*]: Okay. So you understand everything that I read to you?

[*Defendant*]: Yes.

[*Detective*]: Okay. Are you willing to give up those rights and make a statement to us at this time? Talk to us about what we're, talk to us about what we're doing?

[*Defendant*]: No sir.

Indisputably, defendant answered "No sir" when, after he was read his rights and acknowledged his understanding of them, he was presented with the above-quoted follow-up query from the detectives. On its face, it would thus appear, as the majority in fact concludes, that defendant had unambiguously asserted his right to remain silent. Were that in fact the case, I would agree that the detectives could not have interrogated defendant at that time.[4]

---

[4] The majority cites *Michigan v Mosley*, 423 US 96, 100; 96 S Ct 321; 46 L Ed 2d 313 (1975) (quotation marks and citation omitted), for the

However, for the reasons that follow, I conclude, on closer inspection, that defendant's "No sir" response did not constitute an unequivocal invocation of his right to remain silent.[5] As the majority acknowledges, to invoke the right to remain silent, a suspect must "unequivocally" indicate that he or she wishes to remain silent. *People v Catey*, 135 Mich App 714, 722; 356 NW2d 241 (1984); *People v Adams*, 245 Mich App 226, 234-235; 627 NW2d 623 (2001). When the suspect does not unequivocally invoke the right to remain silent,

proposition that "[i]f the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." This is a quotation from *Miranda* itself. See *Miranda*, 384 US at 473-474. However, while this general statement remains true, *Mosley* dealt with the issue of when the police may resume questioning after an *unequivocal* invocation of the right to remain silent. *Mosley*, 423 US at 101. *Mosley* does not address the situation here, where, as explained further later in this opinion, defendant did not unequivocally invoke his right to remain silent; nor does it provide any aid in determining whether "interrogation" took place.

[5] The majority posits that I have "fail[ed] to articulate what part of the word 'no' is equivocal," and goes on to incorrectly suggest that I state or imply that the word "no" is ambiguous and may mean " 'yes,' 'maybe,' 'possibly,' or 'perhaps.' " Of course, that is not my position. The majority misstates my position, attacks a position that I have not taken, and fails entirely to address the merits of this dissent. Simply put, I need not, and do not, contend that the bare word "no," in and of itself, is ambiguous. Rather, read in context and with a proper understanding of *Miranda* and its progeny, defendant's response to the detective's multipart and confusing question, to use the majority's chosen terminology, "allow[ed] the possibility of more than one meaning or interpretation," as explained further later in this opinion. (Quotation marks and citation omitted.) See *People v Adams*, 245 Mich App 226, 239; 627 NW2d 623 (2001) (declining to view transcript words cited by the defendant in isolation and examining the "context" and "circumstances" surrounding the defendant's statement alleged to be an unequivocal assertion of the right to counsel). Moreover, the subsequent dialogue did not constitute "interrogation" for purposes of *Miranda*. See the discussion later in this opinion. The majority, in failing to address the substantive merits of this dissent, and in choosing instead to distort my position, fails to articulate why I am wrong.

police officers are permitted to continue the interview. *Adams*, 245 Mich App at 234-235. Here, viewed in context, defendant's response reflects not an unequivocal invocation of his right to remain silent, but instead reflects understandable confusion about what he was being asked. See *id.* at 239.

To properly understand defendant's initial "No sir" response, we must consider the question(s) to which he was responding. As noted, after reading defendant his rights (i.e., "those . . . six things I read to ya"), the detectives posed the following query to defendant:

> [*Detective Kranich*]: Okay. Are you willing to give up those rights and make a statement to us at this time? Talk to us about what we're, talk to us about what we're doing?

The detectives thus clumsily asked defendant three confusing questions, all combined and compounded into one simultaneous[6] query: (1) "Are you willing to give up those rights [?]", (2) "Are you willing to . . . make a statement to us at this time?", and (3) "Are you willing to . . . talk to us about what we're doing?" Arguably, the second and third questions are essentially the same, inquiring of defendant whether he wished to talk with the detectives notwithstanding the rights that had been read to him.

But the first question ("Are you willing to give up those rights[?]") was entirely inconsistent with the other questions to which it was joined. Specifically, and notably, among the "six things" that comprised the *Miranda* rights that the detectives read to defendant were both the right to remain silent and the right, if he chose not to remain silent, to "at any time change [his] mind and stop talking and stop answering questions."

---

[6] The transcript reflects two question marks, but three inquiries, all posed to defendant simultaneously.

So, by posing their query to defendant in the clumsy, confusing, and compound manner in which they did, the detectives simultaneously and inconsistently asked defendant if he wanted to "give up" both his right to remain silent and his right, if he gave up that right, to "change [his] mind and stop talking and stop answering questions." It is hardly surprising in this context that defendant was confused. He may well have been willing to speak with the detectives, yet unwilling, for example, to "give up" his right to stop talking whenever he chose.[7]

For all of the foregoing reasons, I would hold that defendant did not unequivocally invoke his right to remain silent and the detectives did not fail to "scrupulously honor[]" any exercise of defendant's "right to cut off questioning." *Catey*, 135 Mich App at 725 (quotation marks and citation omitted).

### C. THE CONFUSION WAS REMEDIABLE, AND WAS REMEDIED

The next question, for *Miranda* purposes, is whether the confusion that resulted from the detectives' inartful attempt to comply with *Miranda* was remediable. I conclude that it was and that it must be. Otherwise, we will have mechanically transformed *Miranda* from the intended safeguard against coercive and overzealous police practices into the very "constitutional straightjacket" that *Miranda* itself decried.

Detective Kranich immediately followed up defendant's initial "No sir" response with the following question: "So you don't wanna talk to us?" That question can hardly be described as the kind of coercive or

---

[7] For this reason, I disagree with the majority's conclusion that defendant "unequivocally" made an "assertion of his Fifth Amendment right to remain silent" by responding "No sir" to the detectives' initial inartful query.

overzealous police practice to which *Miranda* was directed. To the contrary, it simply served to further a preliminary dialogue to clarify the confusion that was inherent in the detectives' earlier query, to advance and confirm defendant's understanding of his rights, and to facilitate defendant's knowledgeable decision-making, with regard to the exercise of his rights, in an understandable context. Defendant's immediate response reflects his initial confusion:

> [*Detective*]: So you don't wanna talk to us?
>
> [*Defendant*]: I mean you say give up the rights.

The exchange that continued thereafter reflected a clarification of the confusion, greater clarity of defendant's understanding of his rights, and a knowledgeable decision by defendant to talk with the detectives but not to otherwise "give up" his rights:

> [*Detective Kranich*]: Well no, do you wanna give us, give us a statement at this time? You understand what I read to you.
>
> [*Defendant*]: Yeah.
>
> [*Detective*]: Those are all your rights.
>
> [*Defendant*]: Yeah.
>
> [*Detective*]: Now I'm asking do you wanna make a statement at this time, what we wanna talk to you about?
>
> [*Detective Steven McClean*]: In order for us . . .
>
> [*Defendant*]: Yeap, yes. I understand what you're saying. Yeah, yeah.
>
> [*Detective Kranich*]: Okay, okay. You wanna make a statement then and talk to us.
>
> [*Defendant*]: Yes, I'll make a statement yeah.
>
> [*Detective*]: Okay.
>
> [*Defendant*]: But I'm not give [sic] up my rights am I?
>
> [*Detective McClean*]: You can stop talking –

[*Detective Kranich*]: You can -------- you know at any time you want.

[*Detective McClean*]: If you're uncomfortable about something or if you just simply don't like us, you can say I'm done, okay. You can interrupt us for that matter, it's no big deal. We just wanna set the matter straight. This has been coming on for some time.

[*Defendant*]: Okay.[8]

Beyond a doubt, the handling of the *Miranda*-rights process that the detectives exhibited here was not one that I would encourage others to emulate. They initially stumbled over the reading of some of the rights. They then posed a confusing, compound, inconsistent, and unnecessary query to defendant about "giving up" his rights. Rather than following these detectives' example, others should learn from it and should endeavor to employ a practice whereby they clearly read each of the rights in question, secure the suspect's understanding of them, and then clearly inquire of the suspect whether, understanding his or her rights, the suspect wishes to speak to them.

However, I conclude that, when the totality of the circumstances is examined, the detectives were able to clear up the confusion and secure a valid *Miranda* waiver, as I will discuss further later in this opinion. Thus any confusion that initially resulted did not result in a statement procured by coercion or given by a defendant ignorant of the consequences of his or her actions. See *People v Ryan*, 295 Mich App 388, 397; 819 NW2d 55 (2012); see also *People v McBride*, 273 Mich App 238, 254-255; 729 NW2d 551 (2006), rev'd in part on other grounds 480 Mich 1047 (2008).

---

[8] Defendant thereupon signed a written form waiving his *Miranda* rights.

D. THERE WAS NO "INTERROGATION" FOR PURPOSES OF *MIRANDA*

Equally importantly for *Miranda* purposes, neither the detective's follow-up question ("So you don't wanna talk to us?") nor the succeeding dialogue constituted "interrogation" to which *Miranda* applies. The *Miranda* Court was careful to limit its holding to the "interrogation" process, thereby restricting police officers, upon a defendant's exercise of the right to remain silent, from further "interrogation." *Miranda*, 384 US at 444, and passim. This, of course, raises the question of what constitutes "interrogation" for *Miranda* purposes.

The Court in *Miranda* did not provide a definition of "interrogation" per se, but simply stated that "[b]y custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id.* at 444.

### 1. *INNIS'S* DEFINITION OF "INTERROGATION"

The question of what constitutes "interrogation" for purposes of *Miranda* was answered by the Supreme Court in *Rhode Island v Innis*, 446 US 291; 100 S Ct 1682; 64 L Ed 2d 297 (1980). In *Innis*, two police officers, after repeatedly advising the defendant of his *Miranda* rights, and after the defendant had stated that he understood his rights and wanted to speak to a lawyer, engaged in a dialogue ostensibly directed to each other (and not directed to the defendant). During that dialogue, one of the officers stated that there were " 'a lot of handicapped children running around in this area' " because a school for handicapped children was located nearby, and that " 'God forbid one of them might find a weapon with shells and they might hurt

themselves.' " *Id.* at 294-295. Having overheard the conversation, the defendant interrupted it, stating that the officers should turn the car around so that he could show them where the gun was located. The officers again advised the defendant of his *Miranda* rights, and he replied that he understood them but that he " 'wanted to get the gun out of the way because of the kids in the area in the school.' " *Id.* at 295. The defendant then led the officers to the gun in question.

The defendant in *Innis* unsuccessfully moved to suppress the gun and his statements regarding it. The evidence was introduced at the defendant's trial, and he was convicted on a number of counts. The Rhode Island Supreme Court reversed, finding that the defendant "had been subjected to 'subtle coercion' that was the equivalent of 'interrogation' within the meaning of the *Miranda* opinion." The United States Supreme Court granted certiorari "to address for the first time the meaning of 'interrogation' under [*Miranda*]." *Id.* at 296-297.

As a starting point, the Court in *Innis* looked to *Miranda* itself, and to its reference to " '*questioning* initiated by law enforcement officers . . . .' " *Innis*, 446 US at 298, quoting *Miranda*, 384 US at 444 (emphasis in *Innis*). But notwithstanding *Miranda*'s use of the term "questioning," the Court in *Innis* rejected the suggestion that the *Miranda* principles should apply "only to those police interrogation practices that involve express questioning of a defendant . . . ." *Innis*, 446 US at 298. "We do not, however, construe the *Miranda* opinion so narrowly." *Id.* at 299.

In vacating the reversal of the defendant's conviction, the Court in *Innis* thus supplied the following definition of "interrogation" for purposes of *Miranda*:

> We conclude that the *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term "interrogation" under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. [*Id*. at 300-301.]

The definition of "interrogation" supplied in *Innis* thus did two important things: (1) it broadly construed "interrogation" to include not only "express questioning" but also its "functional equivalent," i.e., in certain circumstances, to also include "words or actions on the part of the police (other than those normally attendant to arrest and custody)"; and (2) it added the qualifier that "the police should know are reasonably likely to elicit an incriminating response from the suspect." *Id*. With regard to the latter, the Court noted that it "focuses primarily upon the perceptions of the suspect, rather than the intent of the police. . . . A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation." *Id*. at 301.

In providing that definition, the Court further clarified that " '[i]nterrogation,' as conceptualized in the *Miranda* opinion, must reflect a measure of compulsion above and beyond that inherent in custody itself." *Id*. at 300. See also *People v Anderson*, 209 Mich App 527, 532-533; 531 NW2d 780 (1995).

### 2. *WHITE*

Our Supreme Court also recently had occasion to apply *Innis*'s definition of "interrogation" in *People v White*, 493 Mich 187; 828 NW2d 329 (2013). In *White*, as in *Innis*, a police officer engaged in commentary after

the defendant had invoked his *Miranda* rights. That commentary was prefaced by the officer's admonition to the defendant that he was " 'not asking you questions, I'm just telling you,' " followed by the officer's statement that " 'I hope that the gun is in a place where nobody can get a hold of it and nobody else can get hurt by it, okay. All right.' " *Id.* at 191. The defendant interrupted the officer's comments and blurted out, among other incriminating statements, that " 'I didn't even mean for it to happen like that. It was a complete accident.' " *Id.* at 192.

Our Supreme Court held in *White* that the defendant was not subjected to "interrogation" within the meaning of *Miranda*. *Id.* at 209. Pursuant to *Innis*, the Court analyzed both whether the defendant had been subjected to "express questioning" and whether he had been subjected to its "functional equivalent." *Id.* at 197-198, 208-209. The Court held that he had been subjected to neither. *Id.* at 209.

The Court concluded in *White* that there had been no "express questioning" for several reasons. First, the officer's comment "was not a question because it did not ask for an answer or invite a response. It was a mere expression of hope and concern." *Id.* at 198. Second, particularly when the conversation is considered in its entirety, "the officer's addition of the words 'okay' and 'all right' at the end of his comment did not transform a non-question into a question." *Id.* Third, the officer prefaced his comment with " 'I'm not asking you questions, I'm just telling you.' " *Id.* at 199. While not dispositive, the Court found that factor "relevant with regard to whether the officer reasonably should have expected an answer." *Id.* Fourth, the fact that the defendant's response (that it was an " 'accident' " and that he " 'didn't even mean for it to happen like that' ")

had nothing to do with the subject of the officer's preceding comment (regarding the location of the gun) "reinforces the conclusion that the officer's comment here was not a question." *Id*. at 200. Fifth, the fact that the officer responded to the defendant's incriminating statement by attempting to "veer the conversation away from any further incriminating statements" serves to "underscore[] that the officer's comment was not 'designed to elicit an incriminating response . . . .' " *Id*. at 200-201, citing *Innis*, 446 US at 302 n 7.[9] Finally, "to the extent that the officer's statement can even be reasonably viewed as a question, this particular question does not seem intended to generate an incriminating response. Instead, if anything, the officer was simply trying to ensure that defendant heard and understood him." *White*, 493 Mich at 201-202.

The Court in *White* additionally held that the defendant "was not subjected to the 'functional equivalent' of express questioning after he invoked his right to remain silent." *Id*. at 202. Noting that "direct statements to the defendant do not necessarily constitute 'interrogation,' " the Court stressed that "the dispositive question is whether the 'suspect's incriminating response was the product of words or actions on the part of the police that they should have known were reasonably likely to elicit an incriminating response,' " *Id*. at 208, quoting *Innis*, 446 US at 303. The Court determined that it was not, rejecting the argument that *Innis* was distinguishable because the officers there "were talking to themselves, and not directly to the defendant." *White*, 493 Mich at 205 ("[W]e do not believe that this difference

---

[9] This is relevant because "the intent of the police . . . may well have a bearing on whether the police should have known that their words or actions were reasonably likely to evoke an incriminating response." *Innis*, 446 US at 301 n 7.

alone requires a different outcome.") *Id.* at 205-206. And the Court further found that none of the criteria referenced in *Innis* was present to support a conclusion that the defendant's incriminating response " 'was the product of words or actions on the part of the police that they should have known were reasonably likely to elicit an incriminating response.' " *Id.* at 208, quoting *Innis*, 446 US at 303.[10]

### 3. *WOODS*

Recently, the United States Court of Appeals for the Sixth Circuit applied the *Innis* definition of "interrogation" in *United States v Woods*, 711 F3d 737 (CA 6, 2013). In *Woods*, an officer in the process of arresting and patting down a suspect asked the suspect, " 'What is in your pocket?' " *Id.* at 739. The suspect responded with an incriminating statement; specifically that he had a gun in his car. *Id.* The suspect had not been advised of his *Miranda* rights. The court concluded that the officer's question did not meet the *Innis* definition of "interrogation" because it "was not an investigatory question or otherwise calculated to elicit an incriminating response, but rather a natural and automatic response to the unfolding events during the normal course of an arrest." *Id.* at 741. The court referred to

---

[10] As the Court noted in *White*, there was " 'nothing in the record to suggest that the officers were aware that [the defendant] was peculiarly susceptible to an appeal to his conscience concerning the safety' " of others. *White*, 493 Mich at 197, quoting *Innis*, 446 US at 302. Also, there was nothing " 'in the record to suggest that the police' " were aware that the defendant was " 'unusually disoriented or upset at the time of his arrest[.]' " *Id.*, quoting *Innis*, 446 US at 302-303. "Furthermore, the officer only made a single remark about the gun. 'This is not a case where the police carried on a lengthy harangue in the presence of the suspect.' " *White*, 493 Mich at 204, quoting *Innis*, 446 US at 303. "Indeed, the officer's comment in [*White*] was far less 'evocative' than the officer's comment in *Innis*." *White*, 493 Mich at 204.

the officer's question as "essentially an automatic, reflexive question" that had "nothing to do with an interrogation as that term is commonly understood." *Id.* Additionally, the court stated that the officer's "question was not reasonably likely to elicit an incriminating response beyond what he was already entitled to know . . . ." *Id.* at 742.

The court also invoked "common sense":

> We believe that our analysis is also consistent with common sense. If we were to hold that the question "What is in your pocket?" amounted to an interrogation such as to require *Miranda* warnings, we would be saying, in effect, that the police were acting lawfully when they drew a gun on Woods, dragged him out of his car by the wrists, ordered him to the ground, cuffed his hands behind his back, and patted him down; but the moment that they asked "What is in your pocket?", they went beyond the bounds of constitutionally permissible action. The Fifth Amendment does not require such an impractical regime of stilted logic. [*Id.* at 742.]

Finally, the court cautioned against elevation of "form over substance" by fixating on whether or not "the alleged interrogation is phrased in the form of a question or a declarative sentence," because the test is "whether the conduct implicates the concerns with police 'compulsion' and 'coercion' that animated the *Miranda* decision." *Id.* at 744, citing *Innis*, 446 US at 299-301.

> The proper interpretation of *Innis* . . . thus requires us to determine whether the words or actions on the part of the police are those normally attendant to arrest and custody, and whether they give rise to the concerns about police coercion that animated the *Miranda* decision. It does not require us to attach talismanic importance to whether the words are punctuated by a question mark. [*Woods*, 711 F3d at 744.]

#### 4. APPLICATION OF *INNIS*, *WHITE*, AND *WOODS*

In applying *Innis*, *White*, and *Woods* to the facts of this case,[11] it is worth noting at the outset that the defendants' invocations of their *Miranda* rights in *Innis* (invoking the right to counsel) and in *White* ("I don't even want to speak") were more unequivocal than defendant's initial expression ("No sir") arguably was here.[12] Those invocations did not end the inquiry in *Innis* and *White*, however, regarding whether subsequent dialogue or events constituted "interrogation" within the meaning of *Miranda*. Even more clearly, defendant's more equivocal expression cannot end the inquiry here.

We must therefore determine whether, in following up defendant's "No sir" response with "So you don't wanna talk to us?" and the succeeding dialogue quoted earlier in this opinion, the detectives here engaged in either "express questioning" or its "functional equivalent," as defined in *Innis* and interpreted in *White*. I would hold that they did neither.

##### a. THERE WAS NO "FUNCTIONAL EQUIVALENT" OF EXPRESS QUESTIONING

To begin, I note that the detective here indisputably asked defendant a follow-up *question*. We therefore

---

[11] I am mindful of the fact that "none of the cited decisions fully addresses the specific circumstances at issue here—few criminal cases are factually identical—these decisions are nonetheless helpful in resolving the present question . . . ." *White*, 493 Mich at 208, n 10.

[12] For the reasons noted, for example, defendant's "No sir" response here was far less indicative of an invocation of *Miranda* rights than was the defendant's " 'I don't even want to speak' " response in *White*, 493 Mich at 191. In context, defendant's "No sir" response exhibited confusion about what he was being asked. Consequently, unlike in *White*, there was here no unequivocal invocation by defendant of his *Miranda* rights. See *id.*

arguably are not faced, as were the Courts in *Innis* and *White*, with the question whether a comment or statement—not punctuated by a question mark—constitutes "interrogation." Therefore, it may be unnecessary for us in this context to even address the "functional equivalent" component of the *Innis* definition of "interrogation." I do so nonetheless, because aspects of the above-quoted succeeding dialogue between the detectives and defendant were in the form of statements by the detectives, rather than questions, and because the "functional equivalent" analysis informs my analysis of the "express questioning" component of the *Innis* test. In so doing I am mindful that *Miranda* does not require this Court to attach "talismanic importance to whether the words are punctuated by a question mark." *Woods*, 711 F3d at 744.

As our Supreme Court noted in *White*, the "dispositive question," even under a "functional equivalent" analysis, is "whether the 'suspect's incriminating response was the product of words or actions on the part of the police that they should have known were reasonably likely to elicit an incriminating response,' " *White*, 493 Mich at 208, quoting *Innis*, 446 US at 303. In my view, that question almost has no place here, because defendant in fact gave no "incriminating response" in response to any of the dialogue in question. All of defendant's responses dealt solely with his understanding of his rights, the meaning of "give up the rights," and an affirmation, after receiving clarification of the detectives' initial query, that defendant indeed wanted to speak with the detectives. Plainly and simply, defendant at that juncture said nothing "incriminating."

Lest it be contended, notwithstanding this, that defendant's *subsequent* incriminating statements, made *after* defendant had knowingly waived his right to

remain silent, were somehow tainted, as the majority concludes by stating that the "police subsequently led defendant to believe that he was not relinquishing his rights by agreeing to make a statement," I will further address the remaining components of *Innis*'s "functional equivalent" test. Specifically, and as in *White* and *Innis*, there is nothing in the record here to suggest that the detectives were aware that defendant was "peculiarly susceptible" in any respect.[13] Unlike the defendant in *White* (who was only 17 years old) defendant here was at least 43 years old at the time of these events.[14] But even in the circumstances presented in *White*, our Supreme Court stated that "the mere fact that defendant was 17 years old and inexperienced in the criminal justice system[15] does not mean that he was 'peculiarly susceptible to an appeal to his conscience' or 'unusual[ly] susceptib[le] . . . to a particular form of persuasion . . . .' " *White*, 493 Mich at 203,

---

[13] In both *Innis* and *White*, where the officers made reference to the location of a gun, the Courts considered whether there was any evidence that each defendant was "peculiarly susceptible to an appeal to his conscience." *Innis*, 446 US at 303; *White*, 493 Mich at 197. Here, by contrast, there was no similar reference, and not even arguably such an appeal.

[14] Defendant was interviewed on December 5, 2010, following his arrest. He gave his birth date as March 17, 1967, making him 43 at the time of the interview. See also defendant's entry on the Michigan Offender Tracking Information System (OTIS), <http://mdocweb.state.mi.us/OTIS2/otis2profile.aspx?mdocNumber=238185> (accessed April 10, 2014) [http://perma.cc/BW3M-9JNA].

[15] Here, defendant was not inexperienced in the criminal justice system; the complaint against defendant states that he was previously convicted of three separate offenses involving the manufacture and delivery of controlled substances and a previous breaking and entering, for which he served substantial prison time. Defendant's sentencing information report indicates that he was assigned 170 points as a Prior Record Variable score (PRV) and placed in Category F, the highest PRV category. The sentencing transcript also reflects defendant's numerous past convictions.

quoting *Innis*, 446 US at 302. Moreover, there is nothing to suggest that the detectives here were "aware" of any "peculiar susceptibility" nor, for the reasons noted, was any " 'appeal to [defendant's] conscience' " or any other " 'particular form of persuasion' " even employed here. *White*, 493 Mich at 202-203, quoting *Innis*, 446 US at 302.

Nor is there anything in the record to suggest that the detectives were aware that defendant was " 'unusually disoriented or upset at the time of his arrest.' " *White*, 493 Mich at 204, quoting *Innis*, 446 US at 303. To the contrary, the record, including the video of the police interview of defendant, reflects otherwise. Nor did the detectives here engage in any " 'lengthy harangue' " or say anything even remotely " 'evocative.' " *White*, 493 Mich at 204, quoting *Innis*, 446 US at 303. Defendant was not subjected even to " 'subtle compulsion,' " which in any event has been held not to constitute " 'interrogation.' " *White*, 493 Mich at 204, citing *Innis*, 446 US at 294-295.

For all of these reasons, I conclude that there was no "functional equivalent" of "express questioning" within the meaning of *Innis* and *White*.

### b. THERE WAS NO "EXPRESS QUESTIONING"

That brings me to the next question that we must address: whether defendant was subjected to "express questioning" in violation of *Miranda*. Again, I would hold that he was not.

As noted, defendant indisputably was asked a follow-up *question*: "So you don't wanna talk to us?" But keeping in mind the perceived evils that *Miranda* was intended to address, every "question" does not equate to "questioning" or, therefore, to "interrogation," for purposes of *Miranda*. See *Woods*, 711 F3d at

744. As the Supreme Court recently noted, "Fidelity to the doctrine announced in *Miranda* requires that it be enforced strictly, but only in those types of situations in which the concerns that powered the decision are implicated." *Fields*, 565 US at ___; 132 S Ct at 1192; 182 L Ed 2d at 31, quoting *Berkemer v McCarty*, 468 US 420, 437; 104 S Ct 3138; 82 L Ed 2d 317 (1984).

The question at issue here ("So you don't wanna talk to us?") had nothing whatsoever to do with the substantive matter about which the detectives sought to question defendant. Certainly, the question invited a response, and the detectives reasonably could have expected one. But the response that was invited, and that reasonably could have been expected, was only regarding *whether* defendant would talk to the detectives, not about *what* he and the detectives would discuss if he chose to do so. Further, in the totality of the circumstances, this question resembles the "automatic, reflexive question" asked by the officer in *Woods*, 711 F3d at 741; it is natural, after all, in a confusing situation, to seek clarity through follow-up questioning.

Relatedly, this particular question clearly was not intended to generate an incriminating response. This factor indeed is critical. Much more than the statement made by the officer in *White* (which related to the substantive issue of the location of a gun), the question here ("So you don't want talk to us?") indisputably could not have reasonably been expected, or intended, to elicit a *substantive* response of any kind, much less an "incriminating" one. To the contrary, the only response that reasonably could have been expected, or intended, related to defendant's understanding of his rights and his willingness to speak with the detectives. See *White*, 493 Mich at 201-202 ("[T]o the extent that the officer's statement can even be reasonably viewed as a question,

this particular question does not seem intended to generate an incriminating response. Instead, if anything, the officer was simply trying to ensure that defendant heard and understood him.").

To close this loop of my analysis, I will again quote the definition of "interrogation" that the Supreme Court supplied in *Innis*, because I believe that definition further supports my conclusion that no "express questioning" occurred here:

> We conclude that the *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term "interrogation" under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. [*Innis*, 446 US at 300-301 (footnote omitted).]

To the extent that it might be argued that the Court's use of the language "that the police should know are reasonably likely to elicit an incriminating response from the suspect" does not apply to "express questioning," but only to "words or actions on the part of the police," I categorically reject that notion, for several reasons. First, our Supreme Court in *White* already has specifically interpreted that language as having application to "express questioning." See *White*, 493 Mich at 200-202.[16] Moreover, the very point of *Innis* was to juxtapose "express questioning" with other "words or actions on the part of the police" as "functional equiva-

---

[16] This Court has concluded similarly. See *People v Elliott*, 295 Mich App 623, 634-635; 815 NW2d 575 (2012), rev'd on other grounds 494 Mich 292 (2013) (the "express questioning of defendant about the robbery in an attempt to obtain defendant's statement constituted an interrogation *because her questions were reasonably likely to elicit an incriminating response from defendant*") (emphasis added).

lent[s]." It would make no sense to apply a qualifier ("that the police should know are reasonably likely to elicit an incriminating response from the suspect") to one but not the other; indeed, they then would not be "functional equivalent[s]." Clearly, therefore, to constitute "express questioning" for purposes of *Miranda,* questions must be ones "that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Innis,* 446 US at 301.

The same reasoning necessarily also holds true for the parenthetical language found in the *Innis* definition of "interrogation." Therefore, in order to constitute "express questioning" for purposes of *Miranda,* questions must be "other than those normally attendant to arrest and custody." *Id.*; see also *Woods,* 713 F3d at 741. This conclusion, of course, dovetails with my earlier observation that the question here ("So you don't wanna talk to us?") was merely a non-substantive inquiry that "simply served to further a preliminary dialogue to clarify the confusion that was inherent in the detectives' earlier query, to advance and confirm defendant's understanding of his rights, and to facilitate defendant's knowledgeable decision-making, with regard to the exercise of his rights, in an understandable context." Simply put, the question was one that was "normally attendant to arrest and custody," because it related to the *Miranda* warning process itself, and not to the substantive, underlying merits of the subject matter that caused those warnings to have to be given to defendant. As such, it did not constitute "express questioning" within the meaning of *Miranda.* See, e.g., *Pennsylvania v Muniz,* 496 US 582, 601-602; 110 S Ct 2638; 110 L Ed 2d 528 (1990) (questions asked for biographical and administrative purposes are not covered by *Miranda* unless they are designed to elicit incriminating statements).

Finally, it can hardly be disputed that neither the detective's follow-up question ("So you don't wanna talk to us?") nor the detectives' succeeding dialogue with defendant exhibited even the least amount of coercion or compulsion, subtle or otherwise. I disagree with the majority's characterization of the subsequent statements by the detectives as "conceal[ing] from defendant the fact that agreeing to talk constituted a waiver of his constitutional rights," resulting in defendants' being led "to believe that he was not relinquishing his rights by agreeing to make a statement." The majority takes issue with the detectives' statement, in the following portion of the colloquy, that defendant could stop talking at any time:

[*Detective Kranich*]: Well no, do you wanna give us, give us a statement at this time? You understand what I read to you.

[*Defendant*]: Yeah.

[*Detective*]: Those are all your rights.

[*Defendant*]: Yeah.

[*Detective*]: Now I'm asking do you wanna make a statement at this time, what we wanna talk to you about?

[*Detective McClean*]: In order for us . . .

[*Defendant*]: Yeap, yes. I understand what you're saying. Yeah, yeah.

[*Detective Kranich*]: Okay, okay. You wanna make a statement then and talk to us.

[*Defendant*]: Yes, I'll make a statement yeah.

[*Detective*]: Okay.

[*Defendant*]: But I'm not give [sic] up my rights am I?

[*Detective McClean*]: You can stop talking –

[*Detective Kranich*]: You can -------- you know at any time you want.

[*Detective McClean*]: If you're uncomfortable about

something or if you just simply don't like us, you can say
I'm done, okay. You can interrupt us for that matter, it's no
big deal. We just wanna set the matter straight. This has
been coming on for some time.

    [*Defendant*]: Okay.

The transcript thus reveals that defendant, mere moments *before* his query to the detectives, had indicated that he understood all of his *Miranda* rights that had been read to him. The majority's reasoning, that the police somehow convinced defendant (by later accurately informing him that he could stop talking at any point) that he could give a statement without waiving his right to self-incrimination is, at best, strained, and in any event is not supported by the record or the caselaw regarding waiver of *Miranda* rights, as discussed in Part III, later in this opinion. The only measure of conceivable compulsion that was even arguably reflected in the circumstances presented was merely that which was "inherent in custody itself." Accordingly, there was no "interrogation." *Innis*, 446 US at 300. Holding otherwise would violate both common sense and the language of *Innis*. *Woods*, 711 F3d at 744, citing *Innis*, 446 US at 299-301.

### III. DEFENDANT KNOWINGLY AND VOLUNTARILY WAIVED HIS *MIRANDA* RIGHTS

In addition, I would hold that defendant "knowingly and voluntarily waived" his *Miranda* rights. *North Carolina v Butler*, 441 US 369, 373; 99 S Ct 1755; 60 L Ed 2d 286 (1979). The "question of waiver must be determined on 'the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused.' " *Id.* at 375 (citation omitted). "The waiver inquiry 'has two distinct dimensions': waiver must be 'voluntary in the sense that it was the product of a free and deliberate choice

rather than intimidation, coercion, or deception,' and 'made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.' " *Berghuis v Thompkins*, 560 US 370, 382-383; 130 S Ct 2250; 176 L Ed 2d 1098 (2010) (citation omitted). This Court has further stated that the analysis of whether a defendant's waiver of his or her rights is valid is essentially the same as that for determining if a confession is admissible, and requires review of the totality of the circumstances. See *Ryan*, 295 Mich App at 397; see also *McBride*, 273 Mich App at 254-255. Here, the totality of the circumstances indicates that the waiver was " 'the product of a free and deliberate choice' " made in the absence of " 'intimidation, coercion, or deception.' " *Berghuis*, 560 US at 382 (citation omitted); see also *Ryan*, 295 Mich App at 398. Additionally, although the process of reaching that point was somewhat labored, I conclude that defendant understood "basically what those [*Miranda*] rights encompass and minimally what their waiver will entail." *McBride*, 273 Mich App at 254 (quotation marks and citations omitted).

Since *Miranda*, the Supreme Court has clarified that the "prosecution . . . does not need to show that a waiver of *Miranda* rights was express"; rather, "[a]n 'implicit waiver' of the 'right to remain silent' is sufficient." *Berghuis*, 560 US at 384, citing *Butler*, 441 US at 376. Here, however, I would find that defendant's waiver of his right to remain silent indeed was made expressly. After receiving clarification of his rights, defendant said, "Yes, I'll make a statement yeah." After being further told that he could stop talking at any time, defendant responded, "Okay." He then signed a waiver of rights form. Without a doubt, defendant's waiver was the " 'product of a free and deliberate choice,' " and did not result from " 'intimidation, coercion, or deception.' " *Berghuis*, 560 US at 382

(citation omitted). It was therefore "voluntary." It also was " 'made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.' " *Id.* at 382-383 (citation omitted).

The question then becomes whether that waiver was effective, given that it was made after defendant's initial "No sir" response. I would hold that it was. For all of the reasons stated already in this opinion, I would find that defendant received proper *Miranda* warnings, there was no unequivocal invocation of defendant's *Miranda* rights, and there was no "interrogation" for purposes of *Miranda*. "The *Miranda* rule and its requirements are met if a suspect receives adequate *Miranda* warnings, understands them, and has an opportunity to invoke the rights before giving any answers or admissions." *Id.* at 387. Those requirements are met here. It would defeat the very purpose of the *Miranda* procedures if, when presented with a degree of confusion about a defendant's rights, such as occurred here, the police and the defendant were forbidden from engaging in any dialogue by which to clarify those rights and to enable the defendant to make an informed decision.

Further, although I would find that no "interrogation" occurred here before defendant's waiver of rights, the Supreme Court has "rejected the rule . . . which would have requir[ed] the police to obtain an express waiver of [*Miranda* rights] before proceeding with interrogation." *Id.* (quotation marks and citation omitted). Absent an unambiguous invocation of rights, even a substantive "interrogation" could have proceeded. *Id.* at 388.

### IV. CONCLUSION

For these reasons, I would hold that no *Miranda* violation occurred here and that the trial court did not

err, even harmlessly, in admitting into evidence defendant's statements to the police detectives. Accordingly, I respectfully dissent from the majority's conclusion otherwise, and concur only in the result reached in Part IV of the majority opinion (and in its concluding Part IX with respect to that issue). As stated already, I concur fully with all other portions of the majority opinion.