# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

UNPUBLISHED
December 13, 2016

Plaintiff-Appellee,

v

No. 328605
Oakland Circuit Court
LC No. 2014-250283-FC

ANTHONY MICHAEL MYERS,

Defendant-Appellant.

Before: JANSEN, P.J., and CAVANAGH and BOONSTRA, JJ.

PER CURIAM.

Defendant appeals by right his conviction, following a jury trial, of first-degree premeditated murder, MCL 750.316(1)(a). The trial court sentenced defendant as a third-habitual offender, MCL 769.11, to life imprisonment without the possibility of parole. We affirm.

## I. PERTINENT FACTS AND PROCEDURAL HISTORY

This case arises from the March, 2014 homicide of Lenore Hartman, a 64-year-old Southfield resident. About a week after her death, defendant, her 54-year-old boyfriend, turned himself in to the police and confessed during an initial interview that he had killed Hartman because she had refused to give him money to purchase crack cocaine. After about 10 hours in a holding cell, defendant initiated a second interview in which he again confessed to killing Hartman and provided more details of the killing. Although the medical examiner opined that Hartman had died of asphyxiation, defendant, who had been using crack cocaine and alcohol during the homicide and for several days following it, claimed during both interviews that he had stabbed Hartman. Defendant was charged with first-degree premeditated murder. At trial, recordings of both interviews were presented to the jury. Defense counsel conceded during closing arguments that defendant's commission of the homicide was not in dispute, but argued that the evidence proved that defendant had acted in the heat of passion, and requested that the jury return a conviction of a lesser-included offense. The jury found defendant guilty as charged. This appeal followed.

## II. FIFTH AMENDMENT

On appeal, defendant first argues that certain inculpatory statements during his second interview with officer-in-charge Detective David Clevenger, and Clevenger's partner, Officer Hancock, were made after defendant invoked his right to an attorney and should therefore have been suppressed as having been obtained in violation of his Fifth Amendment right to have an attorney present during questioning. We disagree.

Although defense counsel brought a pretrial motion to suppress his confessions on the ground that they were not voluntarily made, he did not challenge the statements on the basis of a failure to cease questioning upon defendant's request for an attorney. Therefore, defendant's claim is unpreserved. *People v Gentner, Inc*, 262 Mich App 363, 368-369; 686 NW2d 752 (2004). We review unpreserved claims for plain error. *People v Carines*, 460 Mich 750, 764; 597 NW2d 130 (1999). A plain error is one that is "clear or obvious," and the error must affect the defendant's "substantial rights." *Id*. In other words, defendant must have been prejudiced by the plain error. *Id*. Further, "[r]eversal is warranted only when the plain, forfeited error resulted in the conviction of an actually innocent defendant or an error seriously affected the fairness, integrity or public reputation of judicial proceedings independent of defendant's innocence." *Id*. at 763-764 (internal quotations and alterations omitted).

The Fifth Amendment's Self-Incrimination Clause states that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." US Const, Am V. This declaration is mirrored in the Fifth Amendment's corollary in the Michigan Constitution. Const 1963, art 1, § 17. Reflective of these constitutional protections, a criminal defendant is guaranteed a number of safeguards against involuntary self-incrimination during custodial interrogations. *Miranda v Arizona*, 384 US 436, 444; 86 S Ct 1602; 16 L Ed 2d 694 (1966); *People v Henry (After Remand)*, 305 Mich App 127, 145; 854 NW2d 114 (2014). One of those safeguards is the right to have an attorney present. *People v Marsack*, 231 Mich App 364, 372-373; 586 NW2d 234 (1998) ("[T]he Fifth Amendment right to counsel is a corollary to the amendment's stated right against self-incrimination and to due process.").

In *Edwards v Arizona*, 451 US 477, 484-485; 101 S Ct 1880; 68 L Ed 2d 378 (1981), the Supreme Court held that when a defendant invokes his right to have an attorney present during a custodial interrogation, the defendant may not be subject to further interrogation by the police until an attorney has been made available, unless the accused initiates further communication, exchanges, or conversations with the police. Subsequently, in *Davis v United States*, 512 US 452; 114 S Ct 2350; 129 L Ed 2d 362 (1994), the Supreme Court clarified *Edwards* and stated that courts must determine, by objective inquiry, whether the accused actually invoked the right to counsel. *Id*. at 458-459. "[A]fter a knowing and voluntary waiver of the *Miranda* rights, law enforcement officers may continue questioning until and unless the suspect clearly requests an attorney." *Id*. at 461. "[I]nvocation of the *Miranda* right to counsel requires a statement that can reasonably be construed to be an expression of a desire for the assistance of counsel." *People v Adams*, 245 Mich App 226, 237; 627 NW2d 623 (2001). Police officers are not required to cease their interrogation until the accused makes a reference to an attorney and the reference is unequivocal and unambiguous, such that a reasonable police officer under the circumstances would have understood only that the accused is invoking his right to counsel. *Id*.

-2-

Defendant does not challenge the admissibility of inculpatory statements he made in his first interview with the officers, after he was read his *Miranda* rights and voluntarily signed a waiver. Further, defendant concedes that it was he who initiated his second interrogation, by requesting an additional opportunity to speak with Clevenger and Hancock, and that at the beginning of the second interview, he was again read his *Miranda* rights before signing a waiver. However, defendant claims that, shortly thereafter, he requested an attorney. The interview transcript reads in relevant part as follows:

> [*Clevenger*]: Yes. Ah, you have the right to remain silent. Anything you say can and will be used against you in a court of law. Ah, you have the right to talk to a lawyer before answering questioning. You have the right to have a lawyer present with you while you're answering questions. If you cannot afford to hire a lawyer one will be represented to appoint you [sic] before any questioning if you wish one. You have the right to decide at any time before or during questioning to use your right to remain silent and your right to talk to a lawyer while being questioned. And the last thing it says here, like we did yesterday. Do you understand each of these rights I've explained to you? You [sic] answer is?

> [*Defendant*]: Read that part again.

> *Clevenger*: You understand, which one? Which part?

> *Defendant*: Four.

> *Clevenger*: Four? You do not ah, if you cannot afford to hire a lawyer one will be ah, appointed to represent you before any questioning if you wish one. And the last part here says do you understand each of these rights that I've explained to you?

> *Defendant*: So I can have a lawyer during this question [sic] here?

> *Clevenger*: Well you can't have one right now, we don't have one available right now. Your answer, put your answer here. And the date and time.

> *Defendant*: Four?

> *Clevenger*: Ah, it's Monday, April 7th. And the time is 8:11 p.m. and what you're saying to us, right now, just so we're clear okay? Is you did not want to have a lawyer present with, with you while you're being questioned in reference this, and you don't want to have, have a lawyer right now. Is that what you're telling us?

> *Defendant*: Well I asked for a lawyer and you said you all didn't have a lawyer, you say wasn't a lawyer present right now.

> *Clevenger*: Well, there's not a lawyer present right now, obviously.

-3-

*Defendant*:  You can get me a lawyer why, why you all questioning me.

*Clevenger*:  You have the right to hire a lawyer and have one if you can afford one, okay?

*Defendant*:  But I want to talk to you but I want a lawyer present.

*Clevenger*:  Okay, so what you're saying is that, you want to talk to us?

*Defendant*:  I want to talk to you.

*Clevenger*:  Okay, but you want to have a lawyer present while you're talking with us?  Okay, well.

*Defendant*:  Is that possible?

*Clevenger*:  Well we can't question you right now and reference that.

*Defendant*:  Why?

*Clevenger*:  Because you need to have a lawyer, you're saying that you want a lawyer.

[*Hancock*]:  You're requesting a lawyer be present, so.

*Clevenger*:  This is on you, obviously, you came to us you wanted to do this so, I'm giving you this opportunity if you know, to talk again about this but, I want to protect your rights, and that's important to me and that's important to Detective Hancock, but, you're the only person that can tell us what you want to do we can't tell you what you want to do okay?  and [sic] that's why I wanted to go over these rights with you just so you understand that cause [sic] you're the one approaching us.  You're.

*Defendant*:  I did approach you.

*Clevenger*:  And you're the one.

*Defendant*:  I wanted to talk.  I just asked, could a lawyer be present?  Is that possible?

*Clevenger*:  Do you have a lawyer in mind?

*Defendant*:  No I don't, I can't afford a lawyer.

\* \* \*

*Clevenger*:  . . .  So you're the one that's gonna have to reach out, the court will appoint one for you um, at your arraignment, okay?  But right now we

-4-

can't just call some lawyers off the (inaudible) or some guy I know from (inaudible) say hey this guy wants a lawyer.

Defendant then inquired when he would be charged, and subsequently offered unprompted additional information, at which time Clevenger attempted to ensure that defendant was indeed willing to waive his request for an attorney:

*Defendant*: I'm awake now.

*Clevenger*: You're awake now?

*Defendant*: Yeah. I'm not on crack now.

*Clevenger*: That's good. That's good. So, what you're saying and you, you can change your mind if you want but that's, and like we talked about yesterday.

*Defendant*: Lenore um, had twenty dollars on the nightstand. After all, after all the arguments and things I wanted the twenty dollars. And um, she had a [sic] ATM card and after I, after I stabbed her and laid there with her, I left with both those items. The twenty dollars and the ATM card.

*Hancock*: Now, are you still saying you laid there with her for two days like you told us originally or you left right away with those items.

*Defendant*: I stayed there two days.

*Hancock*: Okay, they you left with those items, okay.

*Clevenger*: Let me ask you this again. Do you want to talk with us? And this is huge, this is a big deal because this is not just some simple case here, okay? Do you want to have a lawyer present with you?

*Defendant*: Yes I do.

*Clevenger*: While you're being questioned here.

*Hancock*: We need to stop.

*Clevenger*: We need to stop, okay?

*Defendant*: Why?

*Clevenger*: Because that's what you're saying. I have to honor, we have to honor your request.

*Hancock*: We can't continue to talk to you.

*Clevenger*: Right.

-5-

*Hancock*:  Okay?

*Clevenger*:  We can't ask you questions about the case.  I mean that's the law, that's the constitution, I mean that's the constitution.

*Defendant*:  I want to help you with this case.

*Clevenger*:  Sure.

*Defendant*:  But I also need to protect myself too.

*Clevenger*:  That's fair, I understand that, we understand that.

*Defendant*:  Which means now if I want a lawyer I go back to where I was at?

*Hancock*:  Yeah.

*Clevenger*:  We'll take you back upstairs.  I mean you have to, I mean that's where you're going it's not like you're gonna go.

*Defendant*:  I'm not.

*Clevenger*:  You know what I'm saying?

*Defendant*:  I know I'm not going home.

*Clevenger*:  Yeah, that, I mean it just, we, and I mean we've been doing this a long time.  I want to make sure that your rights are protected.  It's only fair to you and only fair to anybody else involved in this so, if that's what you're saying that you want lawyer present with you while you're being questioned, like I said it's your constitutional rights, then that's what we'll honor.  Now, if you're saying no I don't want to have a lawyer present and you're, you're adamant about that, I don't want to have a lawyer present, I will answer questions without a lawyer present then that's a different story but that's your decision, that you have to make, we can't make that decision for you.

*Defendant*:  Can you give me a moment let me think about this?

*Clevenger*:  Sure.

*Hancock*:  Sure.

*Defendant*:  Ask your question.

*Clevenger*:  Okay, I'm gonna go over your rights again.

Clevenger then re-read defendant his *Miranda* rights, and defendant again indicated that he understood them, including his right to an attorney. Clevenger again asked defendant whether he wanted an attorney:

> *Clevenger*: Okay. Do you want to have a lawyer present with you in this room, while you're being questioned by us? In reference.
>
> *Defendant*: Not at this time.
>
> *Clevenger*: Not at this time?
>
> *Hancock*: Okay.
>
> *Clevenger*: So what you're saying is, you do not want to have a lawyer right now?
>
> *Defendant*: Not at this time.
>
> *Clevenger*: And you're gonna answer our questions?
>
> *Defendant*: At this time.
>
> *Clevenger*: At this time, okay. And you understand at any time during this questioning.
>
> *Defendant*: I can stop and ask for a lawyer.
>
> *Clevenger*: Okay.
>
> *Defendant*: Is that fa, is that fair?
>
> *Clevenger*: That's fair[.]

Defendant then answered the officers' questions and volunteered information related to his crime, largely confirming information he had already provided to the officers during his first interview.

After a review of the interview transcripts, we conclude that defendant did not unequivocally assert a right to counsel. Defendant, who admitted that he was intelligent and experienced with the criminal justice system, turned himself in to the police before voluntarily and unambiguously waiving his rights. After his initial 2½ to 3 hour long interview, he was taken to a cell where he rested for more than 10 hours before requesting a second interview. At the second interview, the officers took care to re-apprise defendant of his *Miranda* rights and ask him to sign an additional waiver form, which defendant agreed to do. It was only after he had indicated his willingness to waive his rights that defendant began asking the officers questions regarding the possibility of having an attorney present for questioning that day. Upon receiving information and having an opportunity to think, defendant then unequivocally indicated that he understood his rights and wished to proceed without an attorney.

Defendant's questions to the officers clarifying the scope of his right to have an attorney present did not constitute an unequivocal invocation of the right to counsel. Defendant's conversation with the officers makes clear that defendant knew of his right to counsel and knew that requesting an attorney would stop the interview. But defendant chose nonetheless to continue with the interview. Although at one point defendant responded directly to Clevenger's question of whether defendant wanted an attorney with, "Yes I do," this utterance, in context, was not sufficient to invoke the right to counsel and cut off all further questioning under the specific circumstances in this case. Defendant initiated the interview and began the exchange with the detectives regarding the right to counsel by asking if it was "possible" to have an attorney. When defendant thereafter began offering information, the officers actually stopped him and asked him again to consider whether he wanted a lawyer, explaining that they were constitutionally bound to honor defendant's rights and could not continue the interview without an attorney if that was defendant's decision.[1] Defendant, who did not wish to return to his cell and repeatedly stated that it was his wish to speak with the officers, then asked for "a moment" to think. This request for time to consider his options clearly indicated that defendant's previous questions "were merely inquiries into the way the process worked, not an actual demand for an attorney." *Adams*, 245 Mich App at 238.

Further, when defendant subsequently indicated his intent to answer questions, the officers re-read him his *Miranda* rights, for the third time, and asked him to verify that he was voluntarily waiving his right to an attorney for the time being. Defendant again indicated that he was. Not only did defendant fail to unambiguously invoke his right to an attorney, but in this case, the officers engaged in "good police practice" by repeatedly and carefully clarifying whether defendant actually wanted an attorney before moving on with their questioning. *Davis*, 512 US at 461.

Defendant's contention on appeal that the officers went beyond merely trying to clarify his words and instead pressured defendant to waive his right to counsel and to keep talking, is unsupported by the factual record. The officers merely explained, in response to defendant's questioning, the various consequences that would arise from defendant's decision to request an attorney, and defendant was thereafter given the opportunity to weigh his options before the officers would allow him to provide additional information. Indeed, the officers here went above and beyond their obligations by seeking to clarify with defendant his ambiguous requests for information. See *id*. at 459, 461 (explaining that when a suspect makes a reference to an attorney that is ambiguous or equivocal, the police need not cease questioning or seek to clarify the suspect's reference to counsel). Further, inquiries aimed at determining whether a defendant has reconsidered his request for an attorney do not constitute police-initiated interrogation and are

---

[1] In the context of a suspect's invocation of his right to remain silent, officers are not prohibited from attempting to clarify statements that are ambiguous or confusing in context, even if in isolation they appear unequivocal, such as defendant's "yes I do" response in this case. See *People v Henry* (*After Remand*), 305 Mich App 127, 172; 854 NW2d 114 (BOONSTRA, J., concurring in part and dissenting in part).

not improper under *Edwards*. *People v Kowalski*, 230 Mich App 464, 479-482; 584 NW2d 613 (1998). As this Court has explained:

> *And police legitimately may inquire whether a suspect has changed his mind about speaking to them without an attorney.* It is not unusual for a person in custody who previously has expressed an unwillingness to talk or a desire to have a lawyer, to change his mind and even welcome an opportunity to talk. Nothing in the Constitution erects obstacles that preclude police from ascertaining whether a suspect has reconsidered his original decision. [*Id.* at 480, quoting *Edwards*, 451 US at 490 (citations omitted; emphasis added in *Kowalski*).]

Thus, Clevenger did not violate defendant's right to an attorney when he sought to clarify for defendant the procedures involved in requesting an attorney and the consequences of defendant's decision to invoke that right.

Even if we were to find that defendant had unambiguously requested an attorney, reversal would not be required because defendant has failed to prove that the admission of defendant's subsequent inculpatory statements affected the outcome of defendant's trial. Defendant clearly and unambiguously confessed during his first interview to killing Hartman, and he does not challenge that confession here. Although defendant offered some new information during his second interview, such as his theft of Hartman's ATM card, this new information was only minimally probative, given defendant's previous confession, and would have been presented to the jury regardless of whether it came from his interview. Hartman's ATM card was discovered in the vehicle that defendant drove to the police station. Additionally, the statements showing that the card had been used several times after Hartman's death, and surveillance camera videos depicting defendant attempting to use the card, would still have been presented to the jury. Thus, defendant's statement regarding the theft was unlikely to have had an effect on the jury's interpretation of the evidence. Additionally, although defendant stated during his second interview that he had climbed on top of Hartman and placed his hand on her neck, he had also suggested during his first interview that he had done so, although his memory was "fuzzy" at that time.

Defendant asserts that "the jury used [defendant's] unequivocal admission as a basis for concluding beyond a reasonable doubt that [defendant] suffocated the decedent and that the murder was therefore premeditated." Defendant appears to argue that he unequivocally admitted during his second interview to having smothered Hartman, and that it was the "admitted" act of smothering that led the jury to believe that Hartman's murder had been premeditated. This argument lacks merit. First, defendant's statements during the second interview regarding allegations of smothering were hardly "unequivocal."

Second, given the substantial evidence against defendant, it is unlikely that defendant's statements were the sole determining factor in the jury's consideration of premeditation. The evidence technician testified that she found a pillow next to Hartman's bed, with blood on one surface. The forensic scientists then testified that the blood on the pillow was Hartman's, and that Hartman's saliva was also found on the stained portion of the pillow. They also opined that the presence of defendant's skin cells on the sides of the opposite surface of the pillow were consistent with someone holding the pillow down over Hartman's face. Finally, the medical

examiner testified that Hartman had died of asphyxiation, most likely due to a pressured obstruction to her airways, and that her stabbing wounds had been inflicted after her death. As defense counsel acknowledged during closing arguments, "who's going to dispute what [the medical examiner] had to say? That's the way she died." Thus, even if it was necessary for the jury to find that defendant had deliberately asphyxiated Hartman (rather than having stabbed her) in order to find that Hartman's death was premeditated, it is clear that the evidence presented at trial supported the conclusion that defendant had asphyxiated Hartman.

### III. OPINION TESTIMONY

Next, defendant argues that he was deprived of a fair trial when Clevenger was permitted to give improper opinion testimony on the subject of defendant's guilt. We disagree.

Defense counsel objected during defendant's trial to certain statements, arguing that a portion of Clevenger's testimony was impermissible speculation. However, defense counsel did not object to Clevenger's testimony as impermissible opinion testimony. This issue is thus unpreserved. *People v Metamora Water Serv, Inc*, 276 Mich App 376, 382; 741 NW2d 61 (2007). This Court's review of unpreserved issues is limited to plain error affecting defendant's substantial rights. *People v Benton*, 294 Mich App 191, 202; 817 NW2d 599 (2011).

Defendant challenges certain statements made by Clevenger during his testimony on the third day of defendant's trial:

> [*Prosecutor*]: And Detective Clevenger, you indicated -- a couple times in your interview you told [defendant] when the interview obviously was a somewhat lengthy interview that we saw, you said a couple times that you just want to, quote: his statements to match up; I just want it to match up. And you were at the crime scene, correct?
>
> *Clevenger*: Yes.
>
> *Prosecutor*: Based upon what you saw at the crime scene, comparing it to what [defendant] was telling you, did his statements match up to the evidence that you saw?
>
> *Clevenger*: They did not match up. And it's obvious that he -- he killed her. He admitted that. But, you know, after he killed her, he -- he staged the crime scene. And -- And what I mean by that is he didn't have a car, so it wasn't like he could take her body somewhere else. You know, he had smothered her with the pillow. The evidence at the scene suggested that, with the -- the stains on the pillow right behind her head. The fact that her hands were behind -- behind her like that, she was trying to push something or someone off her --
>
> [*Defense Counsel*]: Excuse me. I'm going to object. This is speculation. It is what it is --
>
> *Prosecutor*: Your Honor, --

-10-

*Defense Counsel*:  -- in terms of what is in the record, the way the body is displayed on the bed.  But to speculate beyond that, that's argument; and it's fair for argument but not for testimony from this witness.

*Prosecutor*:  Your Honor -- Judge, I believe some of Detective Clevenger's responses are appropriate or necessary to explain why the interview lasted as long as it did and why he kept asking him about the pillow and why he kept asking him over and over again --

*The Court*:  Yeah, but I don't think it's fair to speculate what she was doing at that time.

*Prosecutor*:  Absolutely your honor.

*The Court*:  Okay?

*Prosecutor*:  Thank you.

Defendant argues that through these statements, Clevenger provided impermissible opinion testimony regarding defendant's guilt, and that although the trial court sustained defense counsel's objection with regard to Clevenger's speculation that Hartman was fighting someone on top of her, Clevenger's opinion that defendant smothered Hartman was still improperly presented to the jury.

The issue of a defendant's guilt or innocence is a question for the jury to resolve, *People v Suchy*, 143 Mich App 136, 149; 371 NW2d 502 (1985), and a witness may not opine about the defendant's guilt or innocence in a criminal case, *People v Heft*, 299 Mich App 69, 81; 829 NW2d 266 (2012).  However, any witness, including a police witness, is permitted to testify "in the form of opinions or inferences" that are (1) "rationally based on the perception of the witness," (2) "helpful to a clear understanding of the witness' testimony or the determination of a fact in issue," and (3) "not based in scientific, technical, or other specialized knowledge." MRE 701.

Here, it should be noted that it is impossible for Clevenger to have impermissibly opined that defendant was guilty of some form of homicide in this case, as defendant conceded that he had killed Hartman.  And the trial court sustained defense counsel's objection regarding Clevenger's speculation that Hartman was trying to push someone off of her.  A fair reading of the remainder of Clevenger's testimony reveals that Clevenger was explaining his investigation and his reasons for asking certain interview questions from his personal perspective.  This type of opinion testimony is expressly permitted under MRE 701.  Clevenger did not testify regarding defendant's guilt in general, nor did he express an opinion about whether defendant had acted with premeditation.  Nor was his testimony similar to statements that this Court has concluded are improper opinions about a defendant's guilt.  For example, in *People v Bragdon*, 142 Mich App 197, 199; 369 NW2d 208 (1985), this Court found that a prosecutor's brazen question to the defendant, "So you're guilty of a crime?" created an improper inference of guilt.  In *People v Parks*, 57 Mich App 738, 750; 226 NW2d 710 (1975), a witness for the prosecution was improperly allowed to testify that he had informed the defendant of his plan to not encourage

their employer to rehire the defendant because the witness was convinced that the defendant was guilty of robbing the employer. There was no such opinion or adoptive admission in this case, nor was one elicited.

Indeed, Clevenger's testimony was more similar to the challenged testimony of two officers in *Heft*, 299 Mich App at 81-83. In *Heft*, the officers were permitted to testify at the defendant's trial that they had become suspicious of the defendant based on facts elicited by the prosecuting attorney. *Id*. at 82. Specifically, they testified that the defendant's explanation about what he was doing near the crime scene seemed unreasonable and untruthful, so they placed him in custody. *Id*. This Court found no impropriety, holding that the officers were not expressing their opinions, but merely explaining the investigative process. *Id*. at 83. Here, as in *Heft*, Clevenger was responding to the prosecutor's questions regarding facts that had already been elicited. Clevenger was not expressing his opinion of defendant's guilt, but explaining the conclusions he had drawn from his observations of the crime scene and the effect they had on his investigation of defendant from that point. This was permissible.

Even assuming that Clevenger offered improper testimony, defendant has not shown that any error affected the outcome of trial. Defendant's contention that Clevenger's testimony "corroborated the medical examiner's testimony," highlights the fact that there was a wealth of other evidence supporting the jury's verdict. As previously discussed, the evidence of defendant's guilt included both physical evidence and expert opinion testimony supporting the inference that Hartman's death was caused by asphyxiation due to smothering; defendant's own statements during his first and second interviews also support such an inference. Defendant's suggestion that the jury would not have relied on all of this other evidence without hearing Clevenger's testimony is unpersuasive. Defendant has therefore not demonstrated plain error affecting his substantial rights. *Benton*, 294 Mich App at 202.

## III. INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant also argues that he was deprived of the effective assistance of counsel when defense counsel failed to (1) file a motion to suppress defendant's inculpatory statements, made at the second interview, on the basis that the police officers had violated defendant's Fifth Amendment right to counsel, and (2) object to Clevenger's improper opinion testimony at defendant's trial. Again, we disagree.

Defendant failed to preserve this issue by bringing a motion for new trial or for a *Ginther*[2] hearing with the lower court. *People v Petri*, 279 Mich App 407, 410; 760 NW2d 882 (2008). This Court's review of unpreserved ineffective assistance of counsel claims is limited to mistakes apparent on the record. *People v Davis*, 250 Mich App 357, 368; 649 NW2d 94 (2002). Whether a person has been denied effective assistance of counsel is a mixed question of law and fact. *People v Matuszak*, 263 Mich App 42, 48; 687 NW2d 342 (2004). "A trial court's findings

---

[2] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

of fact, if any, are reviewed for clear error, and this Court reviews the ultimate constitutional issue arising from an ineffective assistance of counsel claim de novo." *Id.*

The right to effective assistance of counsel during a criminal trial is guaranteed by both the United States and Michigan Constitutions. US Const, Am VI; Const 1963, art 1, § 20. "Effective assistance of counsel is presumed, and a defendant bears a heavy burden to prove otherwise." *People v Swain*, 288 Mich App 609, 643; 794 NW2d 92 (2010). Courts will not second-guess trial counsel's strategic decisions, *People v Henry*, 239 Mich App 140, 149; 607 NW2d 767 (1999), and defendant must overcome the strong presumption that his counsel's conduct was sound trial strategy, *People v Douglas*, 496 Mich 557, 585; 852 NW2d 587 (2014). For a new trial based on ineffective assistance of counsel, defendant must show "(1) that defense counsel's performance fell below an objective standard of reasonableness under prevailing professional norms and (2) that defense counsel's deficient performance so prejudiced the defendant that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *People v Fonville*, 291 Mich App 363, 383; 804 NW2d 878 (2011), citing *Strickland v Washington*, 466 US 668, 694; 104 S Ct 2052; 80 L Ed 2d 674 (1984).

We have already concluded that defendant's claims of error regarding the violation of his Fifth Amendment rights and the admission of the challenged portions of Clevenger's testimony fail. Defense counsel's failure to object to either was therefore objectively reasonable. "Ineffective assistance of counsel cannot be predicated on the failure to make a frivolous or meritless motion." *People v Riley*, 468 Mich 135, 142; 659 NW2d 611 (2003).

Further, as previously discussed, neither the admission of defendant's inculpatory statements nor the prosecutor's elicitation of Clevenger's "opinion" testimony was likely to have had an effect on the outcome of defendant's trial. The jury was presented with all of the evidence it needed to convict defendant of first-degree premeditated murder, even without the evidence that defendant now challenges on appeal. There is nothing to show that the jury would not have found defendant guilty as charged had it not considered the challenged testimony. Without a showing of prejudice, defendant's ineffective assistance of counsel claim must fail. *Fonville*, 291 Mich App at 383.

## IV. COURT COSTS

Lastly, defendant argues that the trial court's order for defendant to pay $500 in court costs lacked statutory authority, and was therefore improper. We disagree.

Defendant failed to preserve this issue by objecting at sentencing to the trial court's imposition of court costs. *Carines*, 460 Mich at 761-762. We review the unpreserved sentencing error for plain error affecting defendant's substantial rights. See *People v Dunbar*, 264 Mich App 240, 251; 690 NW2d 476 (2004), overruled on other grounds by *People v Jackson*, 483 Mich 271 (2009).

A court may impose costs in criminal cases only where such costs are authorized by statute. *People v Cunningham*, 496 Mich 145, 149; 852 NW2d 118 (2014), superseded by statute as recognized in *People v Terrell*, 312 Mich App 450, 461; 879 NW2d 294 (2015), lv

held in abeyance by *People v Terrell*, ___ Mich ___ (2016) (Docket No. 152470). In *Cunningham*, the Michigan Supreme Court held that "MCL 769.1k(1)(b)(*ii*) provides courts with the authority to impose only those costs that the Legislature has separately authorized by statute," and that courts therefore lacked the independent authority to impose court costs in criminal cases. *Id*. at 158. However, as defendant acknowledges, the Legislature subsequently amended MCL 769.1k through 2014 PA 352. The enacting sections of the amended statute explicitly disavow *Cunningham* and are given retroactive effect:

> Enacting section 1. This amendatory act applies to all fines, costs, and assessments ordered or assessed under section 1k of chapter IX of the code of criminal procedure, 1927 PA 175, MCL 769.1k, before June 18, 2014, and after the effective date of this amendatory act.

> Enacting section 2. This amendatory act is a curative measure that addresses the authority of courts to impose costs under section 1k of chapter IX of the code of criminal procedure, 1927 PA 175, MCL 769.1k, before the issuance of the supreme court opinion in *People v Cunningham*, 496 Mich 145 (2014). [2014 PA 352.]

Defendant argues, however, that to the extent that the amendment of MCL 769.1k retroactively authorizes the assessment of generalized court costs, the amendment violates state and federal Ex Post Facto Clauses. US Const, art I, § 10; Const 1963, art 1, § 10. In *People v Konopka (On Remand)*, 309 Mich App 345, 370-376; 869 NW2d 651 (2015), this Court thoroughly addressed and rejected numerous constitutional challenges to the amendment of MCL 769.1k, including the same alleged ex post facto violations being claimed by defendant. To the extent defendant argues that *Konopka* was wrongly decided, his argument lacks merit. This Court is bound by its prior decisions. MCR 7.215(J)(1).

"When a new law makes clear that it is retroactive, an appellate court must apply that law in reviewing judgments still on appeal that were rendered before the law was enacted, and must alter the outcome accordingly." *Mayor of Detroit v Arms Technology, Inc*, 258 Mich App 48, 65; 669 NW2d 845 (2003). By the plain terms of 2014 PA 352, the amended version of MCL 769.1k applies to all fines, costs, and assessments imposed before June 18, 2014, and after the effective date of October 17, 2014. *Konopka*, 309 Mich App at 357. Defendant was sentenced, and the $500 in court costs imposed, on June 23, 2015. Therefore, the amended statute applies and the court's imposition of $500 in generalized court costs was proper.

Affirmed.

/s/ Kathleen Jansen
/s/ Mark J. Cavanagh
/s/ Mark T. Boonstra