*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

LADALE TRACY WILLIAMS-NELSON,

Defendant-Appellant.

UNPUBLISHED
December 17, 2020

No. 349653
Kent Circuit Court
LC No. 18-001609-FC

Before: RONAYNE KRAUSE, P.J., and MARKEY and BORRELLO, JJ.

PER CURIAM.

Defendant appeals by right his jury convictions of second-degree murder, MCL 750.317, possession of ammunition by a felon, MCL 750.224f, possession of a firearm during the commission of a felony (felony-firearm), MCL 750.227b(1), and domestic violence, third-offense, MCL 750.81(2) and (5). The trial court sentenced defendant as a third-offense habitual offender, MCL 769.11, to concurrent terms of 30 to 60 years' imprisonment for the murder conviction, 42 months to 10 years' imprisonment for the felon-in-possession conviction, and 42 months to 10 years' imprisonment for the domestic violence conviction, to be served consecutively to a sentence of 2 years' imprisonment for the felony-firearm conviction. We affirm.

This case arose from the shooting death of Leticia Vela. On December 31, 2017, there was a New Year's Eve celebration at the residence where defendant and Vela lived. At about 11:40 p.m., defendant, Vela, and Vela's friends left the residence but then returned to the home between 1:30 a.m. and 2:00 a.m. Another resident of the home, Samantha Anklam, heard a door slam and then heard something fall. Anklam went upstairs and saw defendant on top of Vela, holding her hair, punching her in the face, and choking Vela. Anklam was able to separate defendant and Vela, but the two fought each other five more times through the earlier morning hours.

According to Anklam, at approximately 4:40 a.m., Vela punched defendant in the face. Anklam testified that defendant "went into the bedroom, he flipped the mattress, he grabbed two handguns, he tucked them into his pants, he put his hood up, [and] he walked to the door." As defendant was leaving, Vela grabbed defendant's hood and indicated that defendant could not leave. Anklam observed defendant turn around and slam Vela against a wall. Anklam testified

-1-

that defendant held a gun with his right hand to Vela's left eye and held her head with his other hand. According to Anklam, Vela told Anklam to get help and call the police because defendant was not going to stop. Defendant then shot Vela. Anklam testified that defendant jumped up and down and yelled, " 'Oh my f*****g God, oh my f*****g God.' " Defendant threw the gun at Anklam and ran from the residence.

Defendant took the stand and gave a different version of events. He testified that after they returned to their residence, defendant and Vela went to their bedroom, and she yelled and screamed at defendant. The two then pushed and shoved each other. Defendant claimed that Anklam intervened during the argument and that the arguing stopped for a brief period. According to defendant, Vela resumed arguing with him, after which the altercation became physical. Defendant decided that he wanted to leave the house but believed that Vela would not let him leave. He went to their bedroom to lie down when he noticed a black and silver handgun on the bed. Defendant testified that as he picked up the gun to put it away, Vela attacked and jumped on him and that the gun went off during the tussle. Defendant asserted that he then "lost it" and ran from the house. He testified to his belief that the gun was not loaded when he put it in the bedroom earlier that evening. Defendant denied that he pushed Vela against a wall before she was shot, and he also denied that he intentionally pointed the gun at her. Defendant further testified that Anklam was not in the bedroom when the gun was discharged. He maintained that Vela's death was an accident.

During his direct examination, defendant contended that he received the black and silver handgun from a "friend" earlier that day. Defendant agreed to store the gun at defendant's residence while his friend was out celebrating New Year's Eve. On cross-examination, the following exchange occurred:

> *Prosecutor.* Where did you get the murder weapon?
>
> *Defendant.* From a friend.
>
> *Prosecutor.* What's that friend's name?
>
> *Defendant.* I cannot—I cannot give you that answer, sir.
>
> *Prosecutor.* Do you know his name?
>
> *Defendant.* Yes.
>
> *Prosecutor.* Give me his name.
>
> *Defendant.* I cannot give you that name, sir, because if I give you that name, that puts my family members involved and it puts them in danger. I cannot give you that name.
>
> *Prosecutor.* Well, you shouldn't have taken the stand then. What is his name?
>
> *Defendant.* I will not give you that name, sir. I plead—

The trial court then directed defendant to answer the prosecutor's question to which defendant responded that he could not provide the individual's name because it would put his family members at risk of harm. The prosecutor then threatened to have all of defendant's testimony stricken, and defense counsel argued that doing so was not the proper remedy. The trial court then excused the jury. Defense counsel formally objected to the prosecutor's question, arguing lack of relevancy. The trial court thought that the question was relevant and could go to the issue of credibility. But the trial court also spoke of defendant's Fifth Amendment right against self-incrimination, pondered the remedy of striking all or part of defendant's testimony, and wondered aloud whether the jury should be allowed to simply decide how to use defendant's refusal to provide a specific name. The trial court never ruled on defense counsel's objection and did decide on how to proceed because defendant voluntarily decided to answer the question. The jury returned to the courtroom, and the court asked defendant whether, after having spoken to his attorney, he was willing to answer the question. Defendant replied, "Yes." Defendant then identified "Clyde," otherwise known as "D," as the person who gave defendant the gun; defendant did not know his last name.

The jury found defendant guilty of second-degree murder, felon-in-possession, felony-firearm, and domestic violence. The trial court sentenced defendant as indicated earlier. Defendant now appeals.

Defendant argues that the trial court abused its discretion by allowing the prosecution on cross-examination to ask him to identify the person who gave defendant the gun. Defendant maintains that the question regarding the source of the firearm was irrelevant and that the prosecution used the irrelevant line of questioning to attack defendant's credibility.

Initially, by agreeing to answer the question the prosecutor posed on cross-examination before the trial court made a definitive ruling, defendant waived his challenge, thereby precluding appellate review. "One who waives his rights under a rule may not then seek appellate review of a claimed deprivation of those rights, for his waiver has extinguished any error." *People v Carter*, 462 Mich 206, 215; 612 NW2d 144 (2000) (quotation marks and citation omitted); see also *People v Henry (After Remand)*, 305 Mich App 127, 162; 854 NW2d 114 (2014) (a defendant is not permitted to harbor error as an appellate parachute).

Moreover, we conclude that there was nothing improper about the prosecutor's simply asking defendant to specifically name the person who gave him the gun after defendant indicated on direct examination that a "friend" had given him the gun to temporarily hold. "A witness may be cross-examined on any matter relevant to any issue in the case, including credibility[,]" although "[t]he judge may limit cross-examination with respect to matters not testified to on direct examination." MRE 611(c). Defendant raised the matter on direct examination, and the prosecutor was free to test the credibility of defendant's claim that he received the gun from a friend by asking the name of the purported friend. "Credibility of a witness is almost always at issue, and thus evidence bearing on that credibility is always relevant." *People v Spaulding*, __ Mich App __, __;

__ NW2d __ (2020); slip op at 11.[1] If a defendant chooses to testify, "his credibility may be impeached and his testimony assailed like that of any other witness." *People v Clary*, 494 Mich 260, 279; 833 NW2d 308 (2013) (quotation marks and citations omitted).

Finally, even assuming no waiver and that the prosecutor's question was improper, we find the innocuous exchange in which defendant first refused to name the individual who gave him the gun, ostensibly to protect family members, but then relented and testified to the person's identity, did not result in a miscarriage of justice or affect the outcome of the proceedings. MCL 769.26; *People v Lukity*, 460 Mich 484, 495; 596 NW2d 607 (1999). Defendant has not presented us with a persuasive argument to the contrary. It is not as if defendant were caught in a lie when he finally identified the "friend" by name. We hold that reversal is unwarranted.

We affirm.

/s/ Amy Ronayne Krause
/s/ Jane E. Markey
/s/ Stephen L. Borrello

---

[1] We recognize that a court *may* deny cross-examination on a collateral matter bearing only on general credibility. *People v Hackett*, 421 Mich 338, 348; 365 NW2d 120 (1984). But assuming such was the case here, we do not find it was improper for the prosecutor to merely ask the question in dispute. Moreover, the trial court ultimately did not have to rule on the objection in light of defendant's decision to respond.